[Civ. No. 9830. Second Appellate District, Division One.—March 19, 1936.]

CHARLES A. TAYLOR, Appellant, v. THE NATIONAL SUPPLY COMPANY OF CALIFORNIA (a Corporation), Respondent.

558

Macfarlane, Schaefer, Haun & Mulford and Raymond V. Haun for Appellant.

Flint & MacKay and Wesley L. Nutten, Jr., for Respondent.

DESMOND, J., *pro tem.* — Appeal from a judgment in favor of defendant in an action for damages for breach of contract.

The plaintiff was engaged with one F. W. Jordan in the business of manufacturing patented oil well machinery and equipment, which business they transferred to a California corporation known as Jordan and Taylor, Inc. The capital stock of that corporation consisted of 2,000 shares of the par value of $100 each. At the time of incorporation, the commissioner of corporations authorized issuance of stock as follows: 16 shares outright to the two incorporators; 250 shares to be sold for cash; 250 shares to the incorporators "whenever and as often as a share or shares of its capital stock are sold", these shares to be held in escrow subject to the further order of the commissioner. The financial statement of the business on January 23, 1929, the date the permit was issued for disposal of the stock, showed gross tangible assets $23,000.51; liabilities, $21,497.02.

On June 26, 1929, a supplemental permit authorized issuance of an additional 500 shares, 250 shares for sale and a total of 250 in escrow to the incorporators "whenever and as often" as stock was sold to the public. A sufficient amount of stock was sold for cash to warrant the issuance in escrow to the incorporators, Taylor and Jordan, of 250 shares each. Besides, they each owned the eight shares issued and delivered to them at the time of incorporation. Sales to the public and issuance of shares to the incorporators brought the total of outstanding stock to 1,016 shares, a point that was never exceeded. The defendant became interested in the corporation after the supplemental permit was issued, and between March 18, 1930, and May 1, 1930, bought from the corporation 156 shares for $15,600 cash, this purchase exhausting the entire amount of stock authorized to be sold to the public. In order to secure control of the corporation, defendant purchased 91 shares from stockholders other than plaintiff and Jordan, and entered into identical agreements with both these men by which it agreed to buy 131 (or alternatively 128 or 123) shares of the escrowed stock belonging to each. In the agreements it was provided that the incorporators would obtain permission from the corporation commission for the transfer and reissue to the defendant, in escrow, of the 131 shares, and as to the purchase price of such stock, the agreement provided as follows:

"The Second Party agrees to pay the First Party for the stock hereby agreed to be purchased, at the rate of $100.00 per share, which sum shall be due and payable to the First Party only at the time and on conditions hereinafter specified. For the eight shares not in escrow, as aforesaid, the aforesaid purchase price shall be due and payable to the First Party upon the transfer and reissue thereof to the Second Party, . . . For the 128 shares in escrow, as aforesaid, the aforesaid purchase price shall be due and payable to the First Party only when, after the transfer and reissue thereof in escrow to the Second Party . . . said shares shall be released from said escrow by permission of said Corporation Commissioner, free and clear of all limitations and conditions imposed by the aforesaid permits, and no part of said purchase price shall be due or payable unless and until all of the escrowed stock hereby agreed to be purchased shall be so released from said escrow. No interest shall in any event be

payable by the Second Party on any part of the purchase price of any of the stock hereby agreed to be purchased."

After defendant made its investment in the early part of 1930, at a time when the corporation was in serious financial difficulties, Jordan and Taylor, Inc., continued for a period of three years to do business under the management of plaintiff, but despite all his efforts, failed to make money. While there was a net profit for a few months after defendant bought its stock, the balance of the period produced a discouraging record of losses. The net loss for 1931 was more than $7,000, for 1932 was about $10,000, and in the first four months of 1933, amounted to $2,568.72. By April, 1933, things were in a bad way, as reflected by the minutes of a special stockholders' meeting held on the 28th day of that month:

"The chairman explained the purpose of the meeting, reported upon the condition of the company, and explained the alternative courses which presented themselves, that is by way of dissolution or by way of assessment on the stock. A general discussion ensued in which the opinion expressed by those who spoke was that the company should be wound up and dissolved, except that Mr. Charles A. Taylor stated, in effect, that although there was no business immediately in sight, he felt that the business should be continued, if possible, and that he hoped that an assessment on the stock might enable the business to go on for a time at least and hoped that a sufficient proportion of the stockholders might be willing to order an assessment and a sufficient number be willing to pay the same. The other speakers expressed the view that an assessment would be only a temporary measure; that it would not solve the difficulties under which the company labored and would undoubtedly labor during the present business depression, and that a sufficient number of stockholders would not be willing to order an assessment or to pay the same if ordered; and that an assessment would only mean a further loss to the stockholders without affording any prospect of ultimate relief to the company."

Of the total authorized issue of stock, namely, 1,016 shares, 967 shares were represented personally or by proxy at that meeting, and a resolution providing for the immediate dissolution of the corporation was passed, the plaintiff casting the only dissenting vote, his fellow incorporator, Frank W.

Jordan, seconding the motion by which the resolution was adopted.

When the corporation, Jordan and Taylor, Inc., was formed, the corporation commissioner required the incorporators, Messrs. Jordan and Taylor, to waive their right to participate in any distribution of capital assets of the company, occurring while the shares were held in escrow, until the owners of all other securities should have been paid the full face or par value thereof; also required them to waive their right to payment and accrual of dividends while the shares were held in escrow "until such time as all stockholders who have paid money for their shares shall have received dividends at the rate of 7% per annum for two consecutive years." By an agreed statement of facts under which this case went to trial, it was stipulated as follows:

"That the Commissioner of Corporations of the State of California has made from time to time certain rules, regulations, and practices of his office pertaining to shares of the capital stock of corporations deposited in escrow under permits issued by said Commissioner, which shares are to be held as an escrow pending the further order of the Commissioner of Corporations. That at all times since the 18th day of March, 1930, the said rules, regulations, and practices of the Commissioner of Corporations pertaining to escrowed stock provided that no order would be granted by him releasing shares of stock from such escrows unless in his opinion the financial condition of the issuing corporation was such that it had earned and paid as dividends an amount equivalent to seven per cent (7%) per annum upon all its issued and outstanding capital stock for a period of at least two years. That between the 18th day of March, 1930, and the voluntary dissolution of Jordan and Taylor, Inc., its financial condition has not been such as to fulfill said rules, regulations, and practices of the Commissioner of Corporations, and that said Corporation Commissioner would not have released said shares of capital stock of Jordan and Taylor, Inc., from escrow during that time had an application been made by either plaintiff or defendant; that owing to the fact that Jordan and Taylor, Inc., had been dissolved the said Corporation Commissioner will not now release said shares of stock or any portion thereof from escrow and said shares of stock can never be released from escrow." Because "said shares of stock can never be released from escrow" and because this

condition resulted directly from dissolution of the corporation, plaintiff sued defendant in this action for $12,800, the price of 128 shares at $100 each, but it is now agreed between the parties that the final number of shares that would have passed under their contract was 123 or $12,300 worth at par.

Appellant contends that when defendant, by its action in voting its majority of all outstanding stock for dissolution, made it impossible for the contingency to arise under which the agreed price of the escrowed stock would be payable, that the amount agreed upon became payable immediately, relying upon the rule stated by Bishop: "If one voluntarily puts it out of his power to do what he has agreed, he breaks his contract, and is immediately liable to be sued therefor, without demand, even though the time specified for performance has not arrived." (Bishop on Contracts, 2d ed., sec. 1426.) There was no express agreement by the defendant, in its contract to purchase stock, that it would not vote for dissolution, but appellant asserts that such a promise was made impliedly. As stated in his brief, "to make the contract reasonable and operative there is an implied stipulation that the defendant would do no act voluntarily which would prevent performance or prevent the occurrence of the condition upon which performance depended."

Respondent counters with various contentions among which we note the following: "If agreement to continue operation of corporation can be implied, performance thereof can only be expected to continue for a reasonable time, and such period had elapsed when dissolution of the corporation occurred." Emphasis is laid upon the fact, too, that appellant knew that respondent wished to acquire control of the corporation and having assisted it in that plan was chargeable, in making his contract to sell stock to respondent, with the knowledge that control carried with it the power of dissolution; therefore, "not having protected himself against this eventuality, he cannot now be heard to complain." It is further urged: "That it would be unreasonable and absurd to find that it was the intention of the parties that defendant should operate the corporation in any event until bankruptcy under the penalty of paying plaintiff the purchase price of the stock for its failure to do so; that such an assumption fails to take into consideration the rights of all the other stockholders owning

889 shares, and operates to protect only one stockholder, the plaintiff, owning only 127 shares.''

Summing up, it appears that appellant's position is this: That respondent, when it acquired a majority of the stock of Jordan and Taylor, Inc., impliedly agreed that no matter what happened, the power to dissolve the corporation would never be exercised voluntarily. In the case of *Foley* v. *Euless*, 214 Cal. 506 [6 Pac. (2d) 956], cited by appellant, where an attempt was made unsuccessfully to recover under a claimed implied promise, the court said, at pages 511, 512: ''Courts have been careful not to rewrite contracts for parties by inserting an implied provision, unless, from the language employed, such implied provision is necessary to carry out the intention of the parties. No implied condition can be inserted as against the express terms of the contract or to supply a covenant upon which it was intentionally silent. The rule is thus stated by the court of appeals of New York in *Genet* v. *Delaware & Hudson Canal Co.*, 136 N. Y. 593 [19 L. R. A. 127, 32 N. E. 1078, 1081] : 'I know very well that implied promises are to be cautiously and not hastily raised. What they are was very well stated in *Scrantom* v. *Booth*, 29 Barb. (N. Y.) 171, 174, in *Allamon* v. *Albany*, 43 Barb. (N. Y.) 33, 36, and in *Booth* v. *Cleveland Roll. Mills Co.*, 6 Hun (N. Y.), 591, 597. They always exist where equity and justice require the party to do or to refrain from doing the thing in question; where the covenant on one side involves some corresponding obligation on the other; where by the relations of the parties and the subject matter of the contract a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it. In this court we have thrown some safeguards about the doctrine to secure its prudent application, and have said that a promise can be implied only where we may rightfully assume that it would have been made if attention had been drawn to it (*Dermott* v. *State*, 99 N. Y. 101 [1 N. E. 242]), and that *it is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate that they intended to effect. (King* v. *Leighton*, 100 N. Y. 386 [3 N. E. 594].)' (Italics ours.)

''This rule was recognized in the case of *Loyalton etc. Co.* v. *California etc. Co.*, 22 Cal. App. 75 [133 Pac. 323, 324], where it was said: 'Where parties have entered into written

engagements which industriously express the obligations which each is to assume, the courts should be reluctant to enlarge them by implication as to important matters. The presumption is that having expressed some they have expressed all of the conditions by which they intended to be bound.' ''

We cannot rightfully assume in the instant case that if the proposal had been made that this respondent should bind itself never to wind up a losing business, it would have been accepted. Quite possibly such a requirement would have been rejected, and in that situation no agreement to sell and purchase the escrowed stock would have been entered into. Manifestly then, it would be unfair to read into this contract a provision which may never have been in contemplation of the parties. The most that can be said in support of appellant's claim of an implied contract appears in the language which we have italicized above in the quotation from Mr. Justice Finch's opinion in *Genet* v. *Delaware & Hudson Canal Co.* Under that fair and lucid reasoning, we believe the respondent in this case was impliedly bound to make a *bona fide* effort for a reasonable length of time to make a success of the business in which it acquired, at least for voting purposes, a majority interest. That the learned trial judge considered such an obligation appears from the findings entered in this case as follows: '' . . . even though by the execution of said contract of March 19, 1930, there could be implied an agreement that it would not do anything to cause a dissolution of such corporation, such agreement, if it could be so implied, would have required defendant to refrain from causing the dissolution of said corporation for a reasonable time only, and the Court expressly finds that a reasonable time had elapsed when the defendant voted for the dissolution of said corporation on April 28, 1933.''

It is true, as appellant points out, that upon dissolution the respondent bought the assets of the corporation at the sale that was held, the proceeds being divided among all the holders of unescrowed stock. However, the sale was advertised in the ''Los Angeles Daily Journal'' and ''The Oil World'' and, at a directors' meeting, attended by appellant, the resolution providing for the sale also instructed the secretary of the corporation ''to mail notice of such sale to such persons or corporations as may be designated to him by any director or directors or any stockholder or stockholders''.

There is no suggestion that there was anything irregular, secretive or underhanded about the sale, and the fact that the escrowed stock could not participate in the proceeds was due to the waiver required by the corporation commissioner and given by the incorporators, appellant and Jordan. In the excellent and exhaustive briefs filed by counsel for both parties in this case, various points of law other than those here discussed have been touched upon, and the authorities cited have had our careful consideration. However, in view of the conclusion we have reached on the main issue, namely, that any implied provision created by the conditions under which the contract was signed has been fulfilled, we deem it unnecessary to take up the other questions.

It seems proper to say that in April, 1930, the respondent as a majority stockholder was faced with the problem of assessing stock, possibly running the corporation seriously into debt, or dissolving the corporation and saving something for all owners of unescrowed stock. Forgetting for the moment the parties to this action, we observe that these owners were unanimously in favor of dissolution.

Judgment affirmed.

Houser, P. J., and Doran, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 18, 1936.