[Civ. No. 14253. First Dist., Div. Two. Aug. 8, 1950.]

RUTH LENCHNER et al., Respondents, v. L. F. CHASE et al., Appellants.

John F. O'Sullivan, Frank J. Perry, and H. Ward Dawson for Appellants.

Raymond H. Shone and Harold B. Lerner for Respondents.

GOODELL, J.—This is an appeal from a judgment against two sets of defendants, namely, Nona Harwick and Chase and Czerny, a copartnership known as L. F. Chase Company.

The trial judge, Honorable Preston Devine, filed an opinion wherein the facts are fairly and fully stated. With a few deletions and additions it reads as follows:

"This is an action for money had and received in the sum of Fifteen Thousand Dollars ($15,000) plus interest. Plaintiffs Ruth Lenchner and Isadore Miller, were prospective purchasers of a tavern in the Mission District of San Francisco, known as 'The Armory.' The owner and licensee of said tavern was Nona Harwick, one of the defendants herein. On July 22nd, 1946, plaintiffs deposited with L. F. Chase and L. F. Chase Company, copartnership, $15,000; said Chase Company is a licensed business opportunity broker. At the time of making the deposit, plaintiffs signed an agreement to purchase the 'Armory Tavern' for the sum of $22,000; the balance of $7,000 to be supplied by a loan from the Bank of America. The Morris Plan Company was later substituted as the lender, apparently with everyone's consent, and it agreed to make the loan. It was stated in the agreement that the Chase Company should act as escrow agent under the supervision of Bank of America, but later the Chase Company alone acted as such escrow agent, with the express oral consent of the seller, at least. The agreement signed by plaintiff provided, in respect of failure on the part of plaintiffs, as follows:

" 'Said sum of $15,000 deposited as above is to be applied to the settlement of all damages sustained by reason of said breach if I do not complete the purchase, and L. F. Chase Company may retain from said sum the amount of any commission or compensation which would be due it upon sale of said property at above price under the terms of said owner's contract, as if it had made said sale to me at said price. The above sale is subject to the approval of the owner.'

"Although a space for the acceptance of the seller was provided on the document, there was no signature of the owner.

"However, the owner, Nona Harwick, had signed a listing with the Chase Company on July 22nd, 1946, in which she

had agreed to sell 'Armory Tavern' for the sum of $20,000; anything above that amount to be retained by Chase Company. It was provided that any sale would be contingent on the purchase of 'The Dungeon,' a tavern in the Marina District, in which Mrs. Harwick preferred to be located, for her home was in that district. On July 26th, the owner of 'The Dungeon' signed an agreement to sell that tavern for $10,000; an amount satisfactory to Mrs. Harwick. The fact that 'The Dungeon' transaction was tied in with that of 'The Armory' so far as Mrs. Harwick was concerned, was not communicated to Lenchner or Miller.

"A partnership agreement was executed between Ruth Lenchner and Isadore Miller on July 31st, 1946, which was witnessed by Mr. Czerny of the Chase Company; and although it was not legal for Miller to have any interest in a liquor establishment, he being an alien, that fact had no bearing upon the later events.

"On August 7th, 1946, Nona Harwick and Ruth Lenchner applied for transfer of the Harwick license to Lenchner. The application, signed by both parties, called attention to that part of Rules and Regulations issued in pursuance of the Alcoholic Beverage Control Act, which requires that the transferor shall be responsible for the conduct of the business until a new certificate is issued, and that 'the transfer of the licensed business shall coincide with the transfer of the license.'"

On August 9 the chief of police protested the granting of the application on grounds which arose in the years from 1938 to 1941. However in 1945 respondent Lenchner was granted a liquor license to operate the "Montana Club," another tavern in San Francisco, under the name Ruth Davis, and her operation of that tavern seems to have been unobjectionable. Testimony was given by an agent of the State Board of Equalization that he had recommended that her application for the transfer of "The Armory" license be granted. That application was denied by the board on November 1, following a recommendation to that effect made by the board's hearing officer on October 21.

An agent of the board informed appellant Harwick of the denial and warned her that she must resume operation of "The Armory" personally or her license would be in jeopardy. She promptly went there on November 13, discussed with respondent Lenchner the board's action, and repossessed the

place. Appellant Harwick had known for some time of the matters of 1938-1941 but had been informed by a responsible agent of the board that there was likelihood the application for the transfer of "The Armory" license would be granted probably because of the satisfactory operation of the "Montana Club" in the intervening years. Appellant Harwick had not known of the 1938-1941 matters at the outset of the negotiations.

To resume the quotation from the opinion:

"Chase Company meanwhile, and on August 12th, 1946, had paid to itself and to its salesman, Edward Riley, commissions on the sales of the 'Armory' and the 'Dungeon' taverns, amounting to some $3,800, on the theory, as testified by Chase's agent, Mr. Czerny that buyers had been produced for both places. On November 7th, 1946, Chase Company requested Mrs. Harwick to make a written demand upon Chase, (an agent of Chase prepared the demand) to pay Emile Hennette, seller of the 'Armory', [should be 'Dungeon'], $10,000 from the escrow fund, and Mrs. Harwick did so demand. Thereupon, on November 7th, 1946, Chase Company paid from the escrow fund $10,000 to Mr. Hennette.

"Lenchner and Miller made demand upon defendants for return of the $15,000 deposited, and this was refused, whereupon the present action was brought. Plaintiffs contend that no contract of purchase of the 'Armory' was completed; that if there was a contract to purchase (they do not admit this because there existed no single document or set of identical documents signed by all parties), it was a contract to pay only if the license could be transferred; that assuming that were not so, there was a mutual rescission when Mrs. Harwick repossessed the tavern.

"I am of the opinion that by all the papers signed by the parties and by their conduct, it was contemplated that the $15,000 would be payable only if the license could be transferred; that the failure to go ahead with the purchase on the part of the prospective buyers was not a voluntary failure, and this distinguishes the case from the cases cited in defendant Harwick's brief, . . . and that the deception practiced by plaintiff Lenchner in attempting to get the license does not justify the forfeiture of the $15,000 deposit.

"Defendant Harwick contends that plaintiffs 'undertook to have the license transferred to them' . . . No such undertaking is contained in their agreement to purchase. There is no provision for forfeiture in event of failure to receive a

license. There was no express warranty in the agreement to purchase that plaintiffs had no police record. In the only paper signed by Mrs. Lenchner and Mrs. Harwick (the affidavit required by the Board of Equalization) it was expressly provided that title must remain with the vendor until a transfer would be approved. And in the agreement to purchase, the sentence relating to applying the $15,000 to damages sustained by failure to complete the purchase does not state whose damages are referred to, the owner's, the agent's or both.

"These being the facts, I believe the case does not come under the rule of those decisions which permit a vendor, when the vendee wrongfully refuses to go ahead with a contract of purchase, to retain any deposit made, regardless of the amount of damage, cases such as *Glock* v. *Howard etc. Co.*, 123 Cal. 1 [55 P. 713, 69 Am.St.Rep. 17, 43 L.R.A. 199]; *Tomboy Gold etc. Co.* v. *Marks*, 185 Cal. 336 [197 P. 94]; *Rayfield* v. *Van Meter*, 120 Cal. 416 [52 P. 666]; *Arkelian* v. *National Bank*, 103 Cal.App. 764 [284 P. 933].

"I believe the cause comes under the rule of such cases as *Green* v. *Frahm*, 176 Cal. 259 [168 P. 114]; *Thomas* v. *Anthony*, 30 Cal.App. 217 [157 P. 823], namely, that the penalty provision in the last paragraph of plaintiffs' Exhibit One is void. Even if it were not so, said provision would not be contractual between the vendor and vendees, but between prospective vendees and the Chase Company.

"The next question is: How much are plaintiffs entitled to recover; Plaintiffs concede that the profits of the business during the term they operated it should be deducted from the $15,000 but they contend that in ascertaining the amount of profit, allowance should be made to them for their personal services in and about the tavern. I believe they are not entitled to charge for such services. There was no express contract calling for payment of wages to them, and a promise can be implied only to enforce a manifest equity or to reach a result which the unequivocal acts of the parties indicate that they intended to effect. *Taylor* v. *National Supply Co.*, 12 Cal.App. 2d 557 at 563 [56 P.2d 263]. Had the police record of Mrs. Lenchner been brought to the attention of Mrs. Harwick, it is probable the latter would not have agreed to pay wages to her and her partner, if, indeed, she would have consented to any part of the negotiations with them. I do not believe there is a 'manifest equity' that warrants their crediting themselves with wages.

"The next question is: Are defendants permitted to set off, against plaintiffs' demand, depreciation in the market value of the 'Armory' (if such depreciation can be proved), between August and November, 1946? I think they are not. The very loose manner of handling the whole transaction, with its absence of any single writing embracing the complete terms of a contract, and the absence of any express binding provision relating to such consequental damages seem to preclude such damages to be allowed the vendor in any event. But as stated above, it is my opinion that the whole contract was contingent upon the approval of the Board of Equalization.

"Finally, there is the subject of the liability of L. F. Chase and Roy C. Czerny who, it is alleged and not denied, are partners as business opportunity brokers. These defendants undertook to act as escrow holders, and although they did not ask nor obtain the signature of the vendees to escrow instructions, they are bound as trustees, Civil Code, section 2219, and are bound to the utmost good faith to the vendees. *French* v. *Orange County Investment Co.*, 125 Cal.App. 587 at 592 [13 P.2d 1046]. Having failed to obtain escrow instructions from plaintiffs, these defendants will be held to the damages caused by their payment of moneys belonging to plaintiffs. (*Gallagher* v. *California Pac. Title & Trust Co.*, 13 Cal.App. 2d 482 at 488 [57.P.2d 195]; *Jones* v. *Title G. & T. Co.*, 178 Cal. 375 [173 P. 586].)

"My conclusion, therefore, is:

"Plaintiffs are entitled to judgment against all defendants, according to the following formula:

"$15,000 minus profits taken by them, not deducting from said profits wages for plaintiffs. On the net amount, interest shall be allowed from November 13th, 1946. There are minor inventory allowances to be made. The subjects of profits and inventory adjustments, if not agreed upon by the parties on or before April 30th, 1948, (and communication thereof made to me), will be determined by a referee to be appointed by the court."

After the opinion was filed findings were made including one that the profits derived from the operation of the tavern between July 30, 1946, and November 12, 1946, were $4,546.74, and that the parties agreed on that figure. Accordingly, judgment was entered for $10,453.26, the difference between the $15,000 and the $4,546.74 profits.

This action was brought on the theory that there was a total failure of consideration as a result of the denial by the State Board of Equalization of the application to transfer the license, which action killed the sale.

There can be no question that a tavern cannot operate without a license, or that such license is transferable only with the approval of the board, or that respondent Lenchner knew this (she having had a license for the "Montana Club"), or that appellant Harwick knew it (she having held several licenses). Appellant Chase Company had handled between 450 and 500 sales of taverns in and about San Francisco. It is agreed by both sides that the contract was entered into in the light of existing state law.

Rule 60(d) of the board provides that "The transferor shall be responsible for the conduct of the licensed business until the license is transferred by the issuance of a license certificate to the transferee. *The transfer of title to the licensed business shall coincide with the transfer of the license.*" (Emphasis added.) This case turns largely on the meaning and effect of the last sentence. On August 7, 1946, respondent Lenchner and appellant Harwick joined in making an application for the transfer of the license which application contained the exact language of rule 60 (d). Both sides agree that such language became a part of the contract of sale. Respondents contend that that language made the sale conditional upon the granting of the application; appellants contend that it "determines the time at which the transfer of title is to take place and nothing more." Whatever may have been the purpose and intent of the board in writing this rule, the court was concerned with the language only as a part of the contract, and it found that the intent of the parties was "that said $15,000 was payable to the seller . . . only upon condition of the transfer of said on-sale general license to plaintiffs, or one of them, and that title to said Armory Tavern should pass to plaintiffs only upon condition of said transfer of the . . . license; . . ." ▮ As we view it, the sentence "The transfer of title to the licensed business shall coincide with the transfer of the license" is susceptible of no interpretation other than that found. True it fixes the event (and the time) when title to the business should pass but it means also that without a transfer of the license there could be no transfer of title to the *licensed* business. It can mean nothing else.

■ The transfer of title to the business (plus license and lease) was the consideration for the payment of the $15,000 and it follows, of course, that if the business could not be transferred there would be a total failure of consideration.

■ Appellants complain that the ''finding'' is not one of fact but a conclusion of law, attempting to interpret the agreement. Even so, that is of no consequence since ''A conclusion of law does not lose its characteristic as such because placed among the findings of fact . . .'' (24 Cal.Jur. 961.) The real question is whether such conclusion, misplaced or not, is supported by the facts. It certainly is, in our opinion, by the sentence already quoted.

■ As appears from the trial court's opinion, appellant Harwick was in negotiation with Chase Company for the purchase of ''The Dungeon'' and apparently was to use part of the money received from ''The Armory'' sale to buy the other place, since the purchase of the one was contingent on the sale of the other. This was a matter between the appellants, and the existence of that other transaction was not communicated to respondents. The court found such lack of knowledge by them. Appellants complain that this separate transaction formed no part of the contract between respondents and appellant Harwick for which reason the finding respecting it is immaterial. It may be conceded that it was no part of the Armory contract but we do not agree that it was immaterial since it bears directly on the actions of all the appellants after November 1, 1946, when it had become known that the sale of ''The Armory'' could not go through. Even if immaterial it did not conflict with the other findings.

■ Appellants contend that respondents breached their contract and therefore cannot recover the $15,000. The court found that the ''failure to complete the purchase of said Armory Tavern was not voluntary on the part of plaintiffs.'' The contract of sale was made in July-August, 1946. Thereafter respondents did the following things to bring about the consummation of the sale: (1) they immediately parted with $15,000; (2) they arranged to borrow the remaining $7,000; (3) they went into possession of ''The Armory'' on July 30, anticipating favorable board action; (4) respondent Lenchner joined with appellant Harwick on August 7, in the application to transfer the license, after the 7-day notice of intended sale (§ 7.2 of the A.B.C. Act) had been given; (5) they even remained in ''The Armory'' almost two weeks after the transfer had been denied. On this evidence the court could not

have found otherwise than that the failure to complete the purchase "was not voluntary on the part of plaintiffs."

Appellants argue that "respondents, by their own acts, made performance by them impossible. This," they say, "has the same effect as though they had voluntarily refused to proceed with performance." In support of this they cite a number of cases on refusal and prevention of performance. Their position is based on the fact that respondent Miller was an alien and that in 1938-1941 the behavior of respondent Lenchner had been such as to warrant the board in refusing its approval of her as a licensee in 1946. The fact, as already appears, is that in 1945, four years after the 1938-1941 episodes, she had been granted a license for "The Montana Club" which shows her bona fides in expecting favorable action in 1946. But be that as it may, a course of conduct in 1938-1941 can hardly be relied on in dealing with the performance of a contract made in July-August, 1946. What respondents did after so contracting in 1946 is the only inquiry, and we have specified at least five distinct, affirmative actions in furtherance of performance of that contract. Appellants point to nothing indicating the contrary. The facts in this record bring the case outside the rule of the refusal and prevention cases cited by appellants, hence it is unnecessary to review or discuss them.

Appellants next contend that respondents "unqualifiedly agreed to purchase The Armory Tavern" and "undertook to have the on-sale general license transferred to them." This is tantamount to saying that their contract was in the nature of a warranty.

The court found that respondents made no representation "as to the nature of their citizenship, moral character, or any representation that the transfer of said . . . license would be obtained" and it is not claimed that this finding is unsupported.

There is no language in any of the several disconnected writings to lend any support whatever to appellants' contention, and certainly no such warranty could be implied in view of the provisions of the Alcoholic Beverage Control Act and the board's rules respecting the transfer of liquor licenses. As already noted, everybody concerned knew the broad powers of the board in such matters (see *Hansen* v. *State Board of Equalization*, 43 Cal.App.2d 176 [110 P.2d 453]) and nobody would be so naïve as to place any reliance on

such a warranty even if an intending purchaser were presumptuous enough to make it.

Appellants, in challenging the action of the court in awarding a recovery, say "There is not one scintilla of evidence that respondents and appellants agreed that the former would have their money returned in the event that the application to transfer the license was denied." There was no need for such an agreement in view of the settled law on the subject. *Riff* v. *Mayhew,* 90 Cal.App.2d 712 [203 P.2d 812], has several points in common with this case. There a contract for the sale of a cocktail lounge (and of course its license) failed of performance because the board refused to approve the transfer of the license. The reason for such refusal was that the applicant was not the real party in interest and his application had contained misrepresentations. It appeared also that a zoning law barred such places from the neighborhood. The buyer had paid $25,000 into escrow and when the board refused to approve the transfer, sued to recover the $25,000. The court said ". . . it would be contrary to both law and equity to permit defendants to retain the $25,000 deposited in escrow by the plaintiff." No authority was cited in support of that statement, presumably because none was needed. The case presented was a simple one of unjust enrichment.

There is no essential difference between a case such as that and this, on the one hand, where a contract was entered into and a failure of consideration eventuated, and a case, on the other, where the negotiations for a contract were abortive and the minds of the parties failed to meet, but money had been paid by the intending vendee. This court had occasion to consider a case of the latter type in *Moore* v. *White, ante,* p. 510 [220 P.2d 918] where we held that the doctrine of unjust enrichment was controlling, citing *Schreyer* v. *Foster,* 98 Cal.App. 706 [277 P. 506], and *Blake* v. *Mosher,* 11 Cal.App. 2d 532 [54 P.2d 492].

With respect to the position of the Chase Company the court found that that appellant took the $3,800 from the escrowed $15,000 "with full knowledge that said transfer [of the license] was not certain to take place . . . in disregard of the escrow instructions, and without the knowledge or consent of plaintiffs or of defendant Nona Harwick . . . for its own use and benefit" and that on November 7, 1946, which was after the transfer had been disapproved, "without the knowledge or consent of plaintiffs and contrary to the terms of the agreement of sale, defendant L. F. Chase Company paid,

out of said escrow funds previously deposited by plaintiffs, the sum of $10,000 to one Emile Hennette, seller of The Dungeon, for the account, use and benefit of defendant Nona Harwick; said payment was made upon the written demand of said defendant Nona Harwick, said demand having been solicited by defendant L. F. Chase Company.''

The facts supporting these findings are uncontradicted and appear in the trial judge's opinion which we have adopted. The ''holder of an escrow is agent for all parties up to the time that the escrow is closed'' (*Early* v. *Owens*, 109 Cal. App. 489, 494 [293 P. 136], citing *inter alia Shreeves* v. *Pearson*, 194 Cal. 699 [230 P. 448]).

For the reasons given in the trial judge's opinion and those added by us respecting the findings (which were made thereafter) the judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.