[Civ. No. 10755.    Third Dist.    July 10, 1964.]

RICHARD C. HOPE, Plaintiff and Appellant, v. CON-
TRACTORS' STATE LICENSE BOARD et al., De-
fendants and Respondents.

Frank Sterle for Plaintiff and Appellant.

Stanley Mosk, Attorney General, E. G. Funke, Assistant Attorney General, and Vincent P. Lafferty, Deputy Attorney General, for Defendants and Respondents.

PIERCE, P. J.—The contractor's license of appellant, Richard C. Hope, was revoked after a hearing on an accusation charging him with violation of Business and Professions Code, section 7113.5 (as in effect in 1959). Under this section adjudication and acts of bankruptcy are cause for disciplinary action. Hope petitioned the superior court for a writ of mandate commanding respondent board to reinstate him. The writ was denied.

Appellant urges that the 1959 version of Business and Professions Code, section 7113.5, is unconstitutional because

(1) it violates the due process clause of the United States Constitution; (2) it is an encroachment upon the exclusive powers of Congress to legislate regarding bankruptcy (U. S. Const., art. I, § 8, cl. 4) and therefore violates the "supremacy clause" (U. S. Const., art. VI, § 2); (3) it constitutes an unlawful delegation of legislative authority to an administrative tribunal. He also urges that, even should he fail to convince in the postulations proffered above, he is entitled to prevail on the proposition (4) that the board acted arbitrarily, capriciously and in abuse of discretion.

Contentions (1), (3) and (4) can be confidently answered. Business and Professions Code section 7113.5, reasonably interpreted, is a valid exercise of the state's police power. The delegation of decision has sufficient guidelines to withstand the charge that it constitutes an abdication of the Legislature's responsibility. In exercising the delegated power, the registrar took and weighed evidence and acted reasonably within the vested discretionary power. We also conclude in answer to contention (2), but with awareness of the closeness of the question presented, that there is "no clear collision"[1] between the challenged state law and the federal bankruptcy law.

Hope became a licensed contractor in July 1956. He filed a petition in bankruptcy in a federal district court March 17, 1961, was adjudicated a bankrupt on the same day and was discharged from all debts and claims on January 29, 1962.

In November 1961 an accusation was filed, charging that while Hope was licensed and acting in the capacity of a contractor he violated the provisions of said Business and Professions Code, section 7113.5, in that he was adjudicated a bankrupt. A hearing was had and the registrar adopted the proposed recommendation of the hearing officer that Hope's license be revoked. A rehearing was requested, granted and held, after which the hearing officer again recommended revocation and the registrar again adopted the recommendation.

We consider first the question of validity of the code provision and propriety of respondents' proceedings in this case, without regard to the question of the compatibility of the state law and the federal Bankruptcy Act.

Business and Professions Code section 7113.5, as enacted in

---

[1]The phrase is Justice Frankfurter's in *Kesler* v. *Department of Public Safety*, 369 U. S. 153, at page 172 [82 S.Ct. 807, 7 L.Ed.2d 641, 655]. This case will be discussed later.

1959, provided in material part: "The adjudication of bankruptcy of a licensee or the confirmation of any other proceeding under the federal bankruptcy law, including a composition, arrangement, or reorganization proceeding, the appointment of a receiver of the property of a licensee as provided in chapter 5 (commencing at section 564) of title 7 of part 2 of the Code of Civil Procedure, or the making of an assignment for the benefit of creditors as provided in title 3 (commencing at section 3449) of part 2 of division 4 of the Civil Code *constitutes a cause for disciplinary action.*

"If a license is suspended or revoked upon the grounds set forth in this section, the registrar in his discretion may renew or reissue such license upon the condition that each contract undertaken by the licensee be separately covered by a bond or bonds conditioned upon the performance of, and the payment of labor and material required by, the contract. [Italics supplied.]

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "

The section has been amended twice, in 1961 immaterially to the discussion here and in 1963 to include provision that "The avoidance or settlement by a licensee for less than their full amount of the lawful obligations of such licensee *incurred as a contractor*" (by bankruptcy, composition, arrangement, assignment for benefit of creditors, etc.) "constitutes a cause for disciplinary action." (Italics supplied.) The amendment also deleted the provision for renewal of revoked licenses conditioned upon bonding.

Discussion of the legislative power to discipline members of an occupation has as its natural prologue, consideration of the problem of the right of control by the Legislature over occupational licensing (and, indeed, the section above quoted is a component of California's Contractors' License Law). (Bus. & Prof. Code, §§ 7000-7158.)

▮ "The right to engage in a legitimate employment or business receives recognition as a portion of the individual freedoms secured by the due process provision of the federal and state Constitutions." (*Doyle* v. *Board of Barber Examiners*, 219 Cal.App.2d 504, 509 [33 Cal.Rptr. 349].) But this right does not close the door to all legislative control over the exercise of the right. As early as 1919 the Supreme Court of California upheld the right of the Legislature, as a proper exercise of the police power, not only to license but also "Where the occupation is one of which it can be fairly said that those pursuing it should have certain particular qualifi-

cations ... to exact reasonable assurances of those pursuing the occupation that they do possess these qualifications.'' (*Riley* v. *Chambers,* 181 Cal. 589, 594 [185 P. 855, 8 A.L.R. 418]; followed and subsequent cases cited in *In re Porterfield,* 28 Cal.2d 91, 99-100 [168 P.2d 706, 167 A.L.R. 675].)

Most, if not all, states have adopted occupational licensing statutes. In certain instances where the Legislature's true purpose has appeared to the courts to be a thinly veiled effort at reestablishment of the guild system under the mere guise of protection of the public, the laws have been struck down as violating economic due process. Constitutionality, however, against both that attack and the charge of violation of equal protection has generally been upheld, the language in *Breard* v. *City of Alexandria,* 341 U.S. 622, being typical (at p. 632-633 [71 S.Ct. 920, 95 L.Ed. 1233, 1243, 35 A.L.R.2d 335, 345]) : '' [W]e think that even a legitimate occupation may be restricted or prohibited in the public interest. . . . The problem is legislative where there are reasonable bases for legislative action.'' (See, also, Monaghan, *The Constitution and Occupational Licensing in Massachusetts,* 41 B.U.L.Rev. p. 157.) Courts are reluctant to question the expediency and wisdom of economic legislation. (*Williamson* v. *Lee Optical of Okla., Inc.,* 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563]; *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U.S. 421 [72 S.Ct. 405, 96 L.Ed. 469]; *In re Porterfield, supra,* 28 Cal.2d 91, 102; *Hart* v. *City of Beverly Hills,* 11 Cal.2d 343, 348 [79 P.2d 1080].) This court had recent occasion to consider occupational regulation by statute in *Doyle* v. *Board of Barber Examiners* (Aug. 1963), *supra,* 219 Cal.App.2d 504, and the opinion of Justice Friedman therein on pages 507-517 deals exhaustively with the problem. (See, also, 33 Am. Jur., Licenses, § 17, p. 336.) Contracting is a vocation regarding which protection of the health, safety and welfare of the people has been held to justify licensing and reasonable regulation. (*Howard* v. *State of California,* 85 Cal.App.2d 361 [193 P.2d 11]; *Franklin* v. *Nat. C. Goldstone Agency,* 33 Cal.2d 628, 630 [204 P.2d 37].) In *Howard, supra,* at page 365, it is stated: ''The purpose of the act is to guard the public against the consequences of incompetent workmanship, imposition and deception.'' In *Fraenkel* v. *Bank of America,* 40 Cal.2d 845, at page 848 [256 P.2d 569], it is said that the ''law was enacted for the safety and protection of the public against imposition by persons inexperienced in contracting work, and for the prevention of fraudulent acts by con-

tractors resulting in loss to subcontractors, materialmen, employees, and owners of structures. [Citations.]"

Appellant is agreeable to the principles and rules expressed in the *Howard* and *Fraenkel* cases, *supra*. Lack of skill, dishonesty, fraud, etc., are causes for withholding, or revocation of, a contractor's license by Business and Professions Code sections 7107-7123 (other than § 7113.5). Appellant concedes their validity. But section 7113.5, covering acts of bankruptcy as ground of disciplinary action, brings something new into the field of regulation of contractors, namely, acts of bankruptcy as a cause for disciplinary action. This, it is contended, goes too far; its effect is to make the Registrar of Contractors a collection agent for materialmen, subcontractors and other tradesmen with whom the contractor deals and therefore exceeds the proper limits of the police power.

We cannot agree. In his enumeration of the classes affected by a contractor's activities, appellant seems pointedly to omit a very important one—the homeowner. More often than not it is he and not the laborer, mechanic, materialman, or subcontractor who is affected by the financially irresponsible contractor. Mechanics' lien laws protect the latter classes. But the prevalence of instances of homeowners left with incompleted homes, or suffering double payment of construction costs, or even suffering foreclosure, as the result of a contractor's improvidence could well suggest an impact sufficient to justify the Legislature's concern with the problem in the public interest. There is, moreover, a less direct but nevertheless substantial effect upon the public at large if and when the incidence of contractor bankruptcies reaches alarming proportions. Losses from such business failures, whether borne immediately by homeowners or by artisans and materialmen are ultimately "passed on" to the consuming public and reflected in higher building costs, thus abetting the spiral of inflation.

We may look to legislative committee reports as extrinsic aid in the interpretation of the legislative purpose in the enactment of a statute. (2 Sutherland, Statutory Construction (Horack's 3d ed.) p. 481 et seq.) To aid us here we have examined the 1957 Report of Senate Interim Committee on the Licensing of Business and Professions, 2 Appendix Journal of Senate 1957. At pages 50-52 we read that the committee listened to the views of a Mr. Henry Ely, an attorney for the Construction Industry Legislative Council. He informed the committee that the construction industry had

the highest ratio of bankruptcies in the United States except restaurants; that "one of the main costs to the public [was] bankruptcy of contractors," and he added: "if suppliers are not paid they very often raise their prices all around to all contractors ... [who] must raise their prices to stay in business, so it really is a damage to the public when there is a bankruptcy." Mr. Ely's recommendation to the committee was that revocation of the bankrupt's license for a specified period or until restitution *be mandatory*. The legislation which followed was not that stringent. It limited proscription to the provision that bankruptcy (and the other mentioned acts of insolvency) would be a *cause* for disciplinary action, the extent of which it left to the registrar's discretion, with the further ameliorating provision that when such disciplinary action consisted of revocation or suspension the license could be renewed or reinstated upon condition that the contractor post a labor and materialmens' bond on each job.

We express our remembrance that "It is not for us to inquire into the expediency or the wisdom of the legislative judgment. Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has not power to strike it down." (Monaghan, *op. cit. supra*, 41 B.U.L.Rev. at p. 159, quoting *Sperry & Hutchinson* v. *McBride, Director*, 307 Mass. 408 [30 N.E.2d 269, 131 A.L.R. 1254].) In *Metro Realty* v. *County of El Dorado*, 222 Cal.App.2d 508, at pages 513-514 [35 Cal.Rptr. 480], this court had occasion to remark upon the diffidence of courts in the exercise of what we termed the "judicial veto."

We hold, therefore, that the provisions of section 7113.5 making bankruptcy or acts of bankruptcy a cause of disciplinary action against a licensed contractor are a proper exercise of the state's police power. In so ruling we interpret the Legislature to have intended (1) to relate the acts of bankruptcy to those connected with the licensee's business and dealings *as a contractor* (as distinguished from a bankruptcy caused by misfortune extraneous to the contractor's business affairs such as, e.g., a nonoccupational liability for personal injuries negligently caused);[2] (2) we keep in mind

---

[2]The phrase "incurred as a contractor" was not inserted in the section until 1963. Usually courts will infer that when the Legislature makes a material change in the language of a statute there was an intent to change the law. But the circumstances may be such as to

that revocation because of bankruptcy is not mandatory; that a discretion is vested in the registrar to weigh its consequence as a cause for disciplinary action.

We answer the contention of appellant that the vesting of discretion in the registrar constitutes an invalid delegation of powers by reassertion of the rule that although the Legislature cannot confer unlimited power upon an administrative officer without designating standards to guide his action (*In re Petersen,* 51 Cal.2d 177, 184 [331 P.2d 24, 77 A.L.R.2d 1291]), it nevertheless need not lay down minutely defined standards and sufficient standards for administrative action may be found by implication from the general purposes of the statute and from the reasons which must have led to its adoption. (*Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control,* 57 Cal.2d 749, 760 [22 Cal.Rptr. 14, 371 P.2d 758].)

We also reject the contention that respondents acted arbitrarily in the disciplinary proceedings at bar. First, it is urged that the evidence does not support the findings of the hearing officer that 80 per cent of the claims filed in bankruptcy were occupation connected. Examining the record to appraise this charge we bog down somewhat arithmetically but suffice it to say that a great majority of claims filed in bankruptcy did originate from business activities.

The record also shows that Hope, before his last contracting venture in Red Bluff, had been in the contracting business in, and in the vicinity of, San Diego; that he had left that area and moved north, leaving substantial unpaid obligations. Among business creditors listed were persons and firms in Escondido, Redding, Chico, Oroville and San Francisco. The Red Bluff project was admittedly speculative—a speculation which proved an unhappy one for creditors to whom Hope owed $25,968.35 (only $715 of which was secured) with his assets totaling only $525. When an assignment for benefit of creditors was made not all creditors were included. All of these things occurred during Hope's relatively brief career of six years as a contractor.

Against this the hearing officer gave consideration to Hope's urged mitigating circumstances—heavy medical ex-

indicate a legislative intent merely to clarify its earlier language. (See *W. R. Grace & Co.* v. *California Emp. Com.,* 24 Cal.2d 720, 729 [151 P.2d 215], and authorities there cited.) Examination into the history of the 1959 act (the original enactment) leaves us with no doubt that the latter was the 1959 legislative intent here.

penses, an obligation to support four children, his successful effort to keep current personal obligations. Failure was attributed by him to an inability to sell homes constructed. Weighing these factors the predominantly emerging picture of financial irresponsibility was sufficient to justify the recommendation and order of revocation. Respondents' decision was neither arbitrary, capricious nor in abuse of discretion.

When reviewing a trial court's judgment affirming findings of administrative bodies, an appellate court limits itself to determining whether substantial evidence in the record supports the judgment. (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20]; *Backman* v. *State of California,* 167 Cal.App.2d 82 [333 P.2d 830]; *Tabory* v. *State Personnel Board,* 208 Cal.App.2d 543 [25 Cal.Rptr. 333]; *Hutchinson* v. *Contractors' State etc. Board,* 143 Cal. App.2d 628 [300 P.2d 216].)

We now reach the contention upon which life of section 7113.5 actually depends: Does it run afoul the federal Bankruptcy Law and the supremacy clause of the United States Constitution?

There is no question about the absolute and exclusive power of Congress to legislate on the subject of bankruptcy. (U. S. Const., art. I, § 8, cl. 4.) The Bankruptcy Act is paramount and the states are without authority to make or enforce laws running counter thereto. (U. S. Const., art. VI, § 2; *International Shoe Co.* v. *Pinkus,* 278 U. S. 261 [49 S.Ct. 318, 73 L.Ed. 318]; *Straton* v. *New,* 283 U. S. 318 [51 S.Ct. 465, 75 L.Ed. 1060].) It has also been held that one of the primary purposes of the Bankruptcy Act is to give the honest debtor new opportunity in life and a clear field for future effort and this purpose is in the public, as well as a private, interest. (*Personal Finance Co. of Colorado* v. *Day* (10th Cir. 1942) 126 F.2d 281; and see *Hanover Nat. Bank* v. *Moyses,* 186 U.S. 181, 192 [228 S.Ct. 857, 46 L.Ed. 1113, 1121].)

All of this respondents concede, but argue that without running counter to the rules stated above state statutes do have a permissible range of operation to withhold privileges properly falling within the state's police power, even though such act of withholding may be predicated upon acts of bankruptcy. This contention is supported by *Kesler* v. *Department of Public Safety,* 369 U. S. 153 [82 S.Ct. 807, 7 L.Ed.2d 641]. That case involved the constitutionality of a Utah statute requiring satisfaction of an automobile accident

judgment as a condition to the reinstatement of the judgment debtor's driver's license. It specifically provided that a discharge in bankruptcy did not relieve the debtor from this condition. It also contained a provision that the judgment creditor by consent might cause the condition to be waived. Against the contention that the state law violated the supremacy clause of the Constitution a majority of the Supreme Court (in an opinion written by Justice Frankfurter) upheld its constitutionality. After noting that claims of conflict between an otherwise valid exercise of the state's so-called police power and the overriding authority of the Bankruptcy Act were rare, the opinion states that the purposes of the state act were wholly unrelated to the purposes of the Bankruptcy Act. A preliminary point of jurisdiction not here important (the propriety of the convening of a three-judge court below) is disposed of. The purpose of motor vehicle financial responsibility laws as a proper exercise of the state's police power is discussed at length. Justice Frankfurter then discusses the 20-year-old decision, *Reitz* v. *Mealey*, 314 U.S. 33 [62 S.Ct. 24, 86 L.Ed. 21], where the court had upheld "the New York variant" of the Utah legislation. (That law, like the bonding provision in the case at bench, had permitted reinstatement of the license upon proof of future responsibility after bankruptcy.) Regarding the *Reitz* case the Frankfurter opinion states (on page 169 of 369 U.S. [60 S.Ct. 24, p. 653 of 7 L.Ed.2d]): "Because the statute was not designed to aid collection of debts but to enforce a policy against irresponsible driving, and because this policy would be frustrated if negligent drivers could avoid the statute by 'the simple expedient of voluntary bankruptcy,' no conflict with the Bankruptcy Act was found."

The same charge that the state was acting as a collection agent for the creditor was made in the *Kesler* case. The opinion answered the contention in the negative. The court states (on p. 170 of 369 U.S. [60 S.Ct. 24, 7 L.Ed.2d on pp. 653-654]): ". . . [A] discharge does not free the bankrupt from all traces of the debt, as though it had never been incurred. This Court has held that a moral obligation to pay the debt survives discharge and is sufficient to permit a State to grant recovery to the creditor on the basis of a promise subsequent to discharge, even though the promise is not supported by new consideration. *Zavelo* v. *Reeves*, *supra*, [227 U.S. 625 (33 S.Ct. 365, 57 L.Ed. 676, Ann.Cas. 1914D 664)]. The theory, the Court declared, is that 'the discharge

destroys the remedy but not the indebtedness.' 227 U.S. at 629 [57 L.Ed. at p. 678]. And in *Spalding* v. *New York* (1846) 45 U.S. (4 How.) 21 [11 L.Ed. 858], under an earlier bankruptcy law, the Court held that a discharge did not prevent the State from collecting a fine for contempt in violation of an injunction issued to aid in the execution of a judgment debt, although the fine was turned over to the creditor. States are not free to impose whatever sanctions they wish. . . . But the lesson *Zavelo* and *Spalding* teach is that the Bankruptcy Act does not forbid a State to attach any consequence whatsoever to a debt which has been discharged.''

The opinion acknowledges that the Utah act did leave the bankrupt to some extent burdened. ''But [says the court] the exercise of this power is deemed vital to the State's well-being, and, from the point of view of its interests, is wholly unrelated to the considerations which propelled Congress to enact a national bankruptcy law. There are here overlapping interests which cannot be uncritically resolved by exclusive regard to the money consequences of enforcing a widely-adopted measure for safeguarding life and safety.''

The court also states (on p. 172 [369 U.S.] [60 S.Ct. 24, 7 L.Ed.2d on pp. 654-655]): ''. . . [T]he 'police power' of a State, especially when exerted for the protection of life and limb, is as pervasive as any of the reserved powers of the States and should be respected unless there is a clear collision with a national law which has the right of way under the Supremacy Clause of article VI.''

And the court concluded that ''Utah is not using its police power as a devious collecting agency under the pressure of organized creditors.''[3]

There are points of difference between the Utah Financial Responsibility Act and the provisions of the Contractors' Licensing Act here under attack. One of such differences could

---

[3]The *Kesler* case was decided by a divided court. Justice Stewart, concurring in part, and Chief Justice Warren, dissenting, believed that the issue of the three-judge trial was wrongly decided. Justice Stewart was of the opinion that, on the merits of the litigation, the Frankfurter opinion was correct. The Chief Justice thought that a feature of the Utah statute under which the judgment creditor was given discretion to determine if and when driving privileges might be restored to the bankrupt judgment debtor brought the state act in conflict with the Bankruptcy Law. The dissenting opinion of Justice Black, with whom Justice Douglas joined, agreed with the majority opinion on the three-judge court issue, but considered the state act altogether in conflict with the federal Bankruptcy Law and invalid under the supremacy clause.

be mentioned as a possible distinguishing factor to further appellant's argument. The other adds weight to tip the scales in favor of the statute's validity. On the one hand, it must be recognized that the Utah Legislature in adopting the law challenged in the *Kessler* case saw a direct connection between financial irresponsibility and reckless driving and was therefore concerned with safety of *"life and limb"* as a manifestation of the police power. Here the public interest affected is frankly economic. It may be conceded that state concern for the economic ills of society is less poignant than the desire and need to protect against the slaughter on the highway (although it is conversely arguable that financial responsibility laws are a somewhat indirect method to cope with reckless drivers, and of doubtful efficacy).

On the other hand, the sanctions of section 7113.5 are much less drastic than those of the Utah Financial Responsibility Act. Here acts of bankruptcy do not require peremptory license revocation. They merely give cause for the taking of some disciplinary action. Whether such action will be taken and, if so, the extent thereof, is left to be gauged by a comprehensive appraisal of all factors relevant to the ultimate issue: Can this person at the present time be deemed competent to continue to pursue a vocation substantially affecting the public weal?

As shown above, concern regarding the financial stability of those who engage in the vocation of contracting is properly encompassed within the state's police power. And once this is established, we find ourselves unable to assert that investigation into, and decision upon, that issue must exclude all consideration of acts of bankruptcy. The "fresh start" concept behind the rule prohibiting state interference with the federal control of bankruptcy and the discharge of the bankrupt's debts was not, in our opinion, intended to extend that far.

We hold that the provisions of section 7113.5 vesting in the registrar the authority to consider acts of bankruptcy as a cause of disciplinary action, which action can extend to the revocation of license, is a valid exercise of the state's police power and is not in conflict with the federal Bankruptcy Act. And that is the limit of our holding. We do not, for example, pass upon the validity of Business and Professions Code section 7102 which includes provision that a revoked license may never be reinstated absent a "proper showing that all loss caused by the act or omission for which the

license was revoked has been fully satisfied." It has been suggested that this provision does constitute a "clear collision" with the debt discharge section of the Bankruptcy Act. (See, *Insolvency as Grounds for Disciplining a Licensed Contractor*, 15 Hastings L.J. 348, 350-352.) Section 7102 was in effect at the time the proceedings against Hope were had. The harshness of the above quoted provisions, however, were greatly softened by the portion of section 7113.5 (as enacted in 1959) which authorized renewal of the license by the registrar "upon the condition that each contract undertaken by the licensee be separately covered by a bond. ..." This bonding provision was deleted by the 1963 legislation. (Stats. 1963, ch. 991.) The stringency of section 7102 is unrelieved, therefore, by any possibility of reinstatement by a showing of present financial stability demonstrated by an ability to obtain a bond. What effect this will have on the constitutionality of the present act, or should this contractor be denied an opportunity to seek reinstatement under the 1959 act (see *McBarron* v. *Kimball*, 210 Cal.App.2d 218, 220 [26 Cal.Rptr. 379]) by a showing of current financial responsibility is not before us.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 2, 1964.