[Civ. No. 1393. Fourth Appellate District.—April 21, 1936.]

J. H. SCOTT, Appellant, v. SUN–MAID RAISIN GROW-ERS ASSOCIATION (a Corporation) et al., Respondents.

354

Louis C. Levy, Boyd & de Journel and Simeon E. Sheffey for Appellant.

Sutherland, Dearing & Jertberg and Dearing & Jertberg for Respondents.

JENNINGS, J.—Plaintiff instituted this action for the purpose of recovering from the defendants damages alleged to have been sustained by him because of the breach by the defendants of a certain written contract entered into, between plaintiff and the defendant Sunland Sales Co-operative Association. During the trial of the action, which took place before the court without a jury, it was stipulated that the contract which was introduced in evidence, although it was not executed by the defendants, Sun-Maid Raisin Growers Association and Sun-Maid Raisin Growers of California, was authorized by them and that it should therefore be considered as the contract of the three defendants. The trial resulted in the rendition of a judgment in favor of the defendants, from which plaintiff has prosecuted this appeal.

The contract for whose alleged breach the action was brought is in the following language:

"This agreement entered into this 22nd day of October, 1925, by and between Sunland Sales Cooperative Association, a California Corporation, hereinafter called the First Party, and J. H. Scott, of San Francisco, hereinafter called the Second Party,

"Witnesseth:

"First party hereby appoints second party its exclusive agent to sell and second party hereby agrees to sell on behalf of first party all of the offal product intended for live stock feed consisting of STW Feed and raisin pulp, produced by the Syrup Plant of Sun-Maid Raisin Growers As-

sociation during the period from November 1st, 1925, to November 1st, 1926, inclusive. Such sales to be made under such terms and conditions as may be determined by First Party except such as may be hereinbelow specifically set forth. All sales shall be made f.o.b. Fresno plant of Sun-Maid Raisin Growers Association for shipment during the next succeeding five months. Payment to be made against drafts with documents attached. Sales to be made at such a rate as to keep the stocks of such products at a minimum, it being understood and agreed that if the undelivered amounts of such stocks shall at any time exceed Four Hundred (400) tons, or if the undelivered amounts of such stocks shall for an aggregate of thirty (30) days of the period from November 1st, 1925, to November 1st, 1926, inclusive, exceed three hundred (300) tons, first party may thereupon cancel this agreement by written notice to Second Party, it being understood that by undelivered stocks is meant manufactured stocks, sold or unsold, prior to the delivery date thereof.

"Second party agrees to devote his exclusive time to the extent necessary to fulfill contract.

"First party agrees to fill orders taken by second party hereunder in accordance with the terms thereof and to use its best efforts to collect for the same and, after deducting from the proceeds of each sale a sufficient amount to net first party twelve dollars and fifty cents ($12.50) per ton on each ton sold, to remit the balance of such proceeds to second party, it being understood that the failure of any buyer to make payment in accordance with the terms of this order, within thirty (30) days after second party has been advised in writing of buyer's failure to make payment, shall entitle first party to cancel this agreement by written notice to second party.

"This agreement shall not be assigned by either party without the written consent of the other.

"In witness whereof, the parties hereto have caused these presents to be duly executed the day and year first above written.

"SUNLAND SALES COOPERATIVE ASSOCIATION

" (First Party).

"By ELLSWORTH BRYCE

" (Second Party)

"By J. H. SCOTT."

Examination of the record discloses that the chief problem which is presented for solution involves the interpretation of the following language contained in the above-described agreement: ''All of the offal product intended for live stock feed consisting of STW Feed and Raisin Pulp, produced by the Syrup Plant of Sun-Maid Raisin Growers Association.''

The trial court interpreted the above-quoted language to mean that thereby the parties to the agreement intended and understood that the contract should cover only a product intended for and manufactured as a livestock feed at and by the syrup plant of Sun-Maid Raisin Growers Association during the term of the contract and that the product would consist of a certain residue resulting from the process of manufacturing raisins for human consumption, commonly known as STW, compounded and ground with raisin pulp, the residue resulting from the manufacture of raisin syrup by said association from raisins unfit for human consumption, including so-called off-grade raisins. From the interpretation thus placed by the court on the language of the contract, appellant vigorously dissents.

It is appellant's primary contention that the contract must be interpreted as being an agreement by respondents to sell to the appellant all the offal consisting of STW feed (wherever produced) and all the offal consisting of raisin pulp produced by the syrup plant. It is declared that this must be the proper construction of the language for the obvious reason that the syrup machinery could produce no offal other than raisin pulp and conversely no ''syrup pulp'' could be produced at any other place except the building where the syrup was manufactured. It is further urged that appellant's understanding that two different products were to be provided for him is correct and proper because of the reference in the agreement to ''stocks and products'' and to ''amounts'', the use of the plural being persuasive of the fact that more than one product was contemplated. It is also argued that the use of the word ''all'' in conjunction with the term ''offal'', which latter term is said to be plural in its nature, is indicative of an intent that more than one product was to be furnished to appellant to be sold by him. It is said that the words ''intended for live stock feed'' mean ''usable for live stock feed''. Various rules established for the interpretation of contracts whose terms are

ambiguous are relied on by appellant in support of his contention that the trial court incorrectly construed the language of the agreement which forms the basis of the present dispute. Among these rules may be noted the familiar principle that in cases of ambiguity the language of an agreement is to be interpreted most strongly against the party who has caused the uncertainty to exist and the promisor is presumed to be such party. It is pointed out that the uncontradicted evidence showed that respondents prepared the agreement and it is urged that therefore the language of the instrument whose meaning is doubtful must be construed most favorably to appellant and most strongly against respondents. Another canon of construction relied on by appellant is that an interpretation which is reasonable, fair and just is preferred to one which is unreasonable, unfair and extraordinary. It is declared that, for numerous reasons, the construction which appellant insists is a proper construction is obviously reasonable, fair, and just and that it makes the agreement effective and operative, whereas, the interpretation which was successfully urged by respondents is manifestly unfair to appellant, unreasonable in scope, and extraordinary in that it does not square with the plain language and grammatical construction of the contract and that its effect is to make the agreement noneffective and nonoperative.

In giving consideration to appellant's contention that the language of the agreement which he insists is ambiguous may only be interpreted in accordance with his views and that any other construction is unfair and unjust to him and does violence to the language and syntax of the instrument, certain undisputed facts must be borne in mind. In the first place, it must be noted that appellant prevailed in his insistence that the language is ambiguous. The record demonstrates that respondents strenuously contended throughout the lengthy trial of the action that there is no ambiguity and uncertainty in the phraseology of the instrument and that parol evidence was therefore unnecessary to aid the court in the task of construction. The court, however, accepted appellant's view and permitted to be admitted all evidence offered by appellant which tended to show the circumstances preceding the execution of the instrument as well as those which followed its execution. The

trier of facts was therefore fully informed of all the circumstances and facts surrounding the making of the written agreement and its conclusion intelligently formed on so ample a showing may not lightly be dismissed.

In the second place, the construction placed upon the language by the trial court under the circumstances disclosed by the record herein, if it appears to be consistent with the intent of the parties, should not be disturbed by a reviewing court even though another interpretation would seem equally tenable from the facts developed by the evidence. (*Kautz* v. *Zurich Gen. A. & L. Ins. Co.,* 212 Cal. 576, 582 [300 Pac. 34] ; *Wilson* v. *Brown,* 5 Cal. (2d) 425 [55 Pac. (2d) 485] ; *Serviss* v. *Jones,* 133 Cal. App. 640, 642 [24 Pac. (2d) 881] ; *Hale* v. *Harbor Petroleum Corp.,* 139 Cal. App. 455, 462 [33 Pac. (2d) 1039].) When the meaning of the language of a contract is uncertain or doubtful and parol evidence is introduced in aid of its interpretation, the question of its meaning is one of fact and a finding of fact made by the trier of facts embodying his interpretation of the doubtful language must stand if not lacking in evidentiary support. (*Thomson* v. *Leak,* 135 Cal. App. 544, 548 [27 Pac. (2d) 795] ; *Gallatin* v. *Markowitz,* 139 Cal. App. 10, 13 [33 Pac. (2d) 424] ; *Coats* v. *General Motors Corp.,* 3 Cal. App. (2d) 340, 356 [39 Pac. (2d) 838].)

Finally, it must be remembered that the purpose and object of the task of interpretation is to discover the intent of the parties and that all rules of construction are established with this end in view.

In its finding V the trial court incorporated its interpretation of the language of the contract which was maintained by appellant to be doubtful and ambiguous. It there found contrary to appellant's contention that it was the intention and understanding of the parties that the agreement should cover only a product intended for and manufactured as a livestock feed at and by the syrup plant of the Sun-Maid Raisin Growers Association during the term of the contract and that this product would consist of certain residue resulting from the process of manufacturing raisins for human consumption, commonly known as STW, compounded and ground with raisin pulp, the residue resulting from the manufacture of raisin syrup from raisins unfit for human

consumption by the above-mentioned association. The court further found that prior to and at the time the agreement was executed appellant knew that the livestock feed covered by the contract was to be manufactured and produced at the syrup plant of the respondent association and that no product intended to be used as livestock feed was being produced or was intended to be produced at any other plant than the syrup plant and further that at no time during the term of the contract was any livestock feed produced at any place other than at the syrup plant. The court also specifically found that the word "all" was used in the contract solely for the purpose of indicating that the entire amount of livestock feed produced at the syrup plant would be available for sale by appellant and that the word had no reference to any estimates of capacity of production of such feed "it being expressly found that no such estimates were ever made by the defendants or any of the defendants".

Examination of the bill of exceptions through whose medium this appeal is presented demonstrates the futility of appellant's contention that the interpretation thus drawn by the trial court is incorrect. The very phraseology and syntax of the particular portion of the agreement which appellant maintains is uncertain and ambiguous sustains the construction adopted by the trial court. Furthermore, the record contains ample evidence to support the court's interpretation.

Appellant was not justified in believing that there would be available for disposal by him all offal or waste of any or all plants maintained by respondents. The language of the agreement fully informed him that there would be available an "offal product" and only such product as was intended for a single definite purpose, viz.: feed for livestock, and further and more specifically, that this product would consist of "STW Feed and Raisin Pulp". Further, the evidence showed that at the time the agreement was made there was on hand available for sale at the plant operated by respondents a considerable quantity of a product which was called "STW Feed" which had been manufactured for the purpose of livestock feed and which respondents were anxious to sell. The use of the comma immediately following the word "pulp" would be enlightening if no evidence other than the language of the agreement had been available to

aid the trial court in the task of interpretation. The punctuation thus employed would indicate that the language which immediately follows: ''produced by the Syrup Plant'' modifies and was intended to qualify not only ''Raisin Pulp'' with which it is in juxtaposition but also STW feed. Happily, however, the trial court did not restrict itself merely to the bare wording of the agreement and was not therefore limited to a study of phraseology and punctuation. Adopting appellant's contention that the language of the contract was uncertain and ambiguous the court permitted the widest latitude in the reception of evidence so that it might be placed in the seats of the parties and perform the task of interpretation in the light of all facts and circumstances which preceded and followed the execution of the instrument. The evidence which was produced showed that the STW feed which was on hand when the agreement was entered into had been manufactured at an experimental plant known as the Pilot plant, that it contained raisin pulp, and that all feed which was produced after execution of the written contract and which was shipped in fulfillment of orders sent in by appellant was manufactured at the syrup plant and contained raisin pulp which was solely a by-product of syrup manufacturing. The evidence also showed that after the contract was executed appellant gave instructions covering shipment of the product covered by the agreement, which instructions required an analysis tag to be affixed to each sack of feed for the purpose of complying with the state law and that such a tag purporting to show a guaranteed analysis of ''Scott's Raisin Pulp Feed'' was furnished by the respondent, Sunland Sales Co-operative Association. The trade name which was adopted by appellant as descriptive of the product which he was endeavoring to sell under the contract which he had made is significant in that it contains the words ''Raisin Pulp'' and indicates that appellant fully realized that one of the components of the product covered by his contract was raisin pulp.

It is extremely difficult to understand what evidentiary basis appellant has for his contention that the trial court erroneously found that there was no inducing representation that all of the STW and syrup pulp which would be produced during the term of the contract would amount to between 25,000 and 30,000 tons. While it is true that

appellant himself on direct examination testified that inquiries made by him elicited the information from various named officers and employees that between 25,000 and 30,000 tons of the product would be available, he later admitted that no one told him that he would be furnished such an amount and the various individuals who were first mentioned by him as the source of his information and who were called as witnesses during the trial, with the single exception of Mr. L. R. Payne, who had died prior to the trial, denied that they had made any such representation. The witness Klein, for example, testified that at no time did he furnish to appellant any tonnage figures as to the quantity of stock feed which would be produced during the year beginning November 1, 1925, and that it would have been impossible to discuss any particular tonnage figures for the reason that the production of stock feed was on an experimental basis. The witness Paul, who was general manager of respondent Sun-Maid Raisin Growers Association during the time covered by the contract, testified that appellant asked him about the quantity of feed that might be produced and that his reply to the inquiry was: ''We have no exact knowledge. We don't know.'' The witness Williams, who was assistant to the general sales manager of respondent Sunland Sales Cooperative Association at the time the contract was made, testified that he did not recall making any personal representations to appellant as to the exact quantity of offal products to be furnished him, that he never had any definite knowledge of the capacity of the syrup plant or of the other departments of the manufacturing plant and was not therefore in a position to have communicated any figures to appellant as to anticipated production of stock feed. It is manifest, therefore, that the court's finding that no such representation was made to appellant is fully sustained by the evidence.

The appellant contends that the trial court, over his objection, erroneously admitted evidence offered by respondents which tended to show that the production of a comparatively small amount of stock feed during the term of the contract was due to difficulties encountered in grinding the raisin stems and tailings and in drying the raisin pulp which was produced as a by-product in the manufacture of syrup. Appellant's complaint in this regard is twofold. He main-

tains, first, that the contract obligated respondents to furnish two different products, viz.: STW feed and raisin pulp, that the pulp was not merely a component part of the STW feed, but an entirely different product and that therefore evidence which tended to show difficulties encountered in drying the pulp could furnish no possible excuse for the failure to produce the product known as STW feed. He further contends that the contract called for the furnishing to him of all offal or waste from the plants of respondents which he was given to understand would amount to between 25,000 and 30,000 tons and that difficulty or impossibility of production could not excuse performance.

In the final analysis, these contentions depend upon interpretation of the language of the agreement. The trial court, as above noted, arrived at the conclusion that the contract called for the manufacture by respondents of a single product viz.: STW feed, which was to be composed of ground raisin stems, tailings and waste and raisin pulp and that it did not bind respondents to provide any definite amount of such feed and further that it was not represented to appellant that any definite amount would be produced. As above indicated, it is our opinion that the court's interpretation is reasonable and proper and is fully sustained by the evidence. Since the agreement did not specify any definite amount of the product which was to be manufactured, but simply provided that appellant should be entitled to receive all of whatever amount that should be produced it is evident that the factor of good faith on the part of respondents in providing the produce was not immaterial or irrelevant to the issues presented. Appellant maintained that, although the written agreement made no mention of any definite amount of the product which would be furnished to him for sale by respondents, nevertheless, he was led to believe that a very large tonnage would be available. The evidence produced by appellant showed that only 561¾ tons of the product were furnished although appellant actually sold and sent to respondents orders for the shipment of 1490 tons in addition to the above amount. Under these circumstances, we entertain the opinion that it was not error for the trial court to admit evidence which tended to show why the full amount of the feed which appellant had actually sold and for which he had obtained orders was not produced. Since the contract com-

prehended the entire output of a certain product, good faith on the part of respondents in its manufacture was required and the production of a comparatively small amount, particularly in view of the fact that appellant was insisting that he had been given to understand that between 25,000 and 30,000 tons would be available, at least justified a showing by respondents as to why a larger amount was not produced. (*Rosenberg Bros. & Co. v. Beales,* 56 Cal. App. 212 [205 Pac. 18].)

█ Appellant maintains that since the undisputed evidence showed that he sent to respondents orders for the shipment of 1490 tons of the product which were rejected and unfilled by respondents, he was entitled at least to recover the loss which he sustained by reason of the failure of respondents to fill these orders. In presenting this contention he relies particularly on the language of the contract by which respondent Sunland Sales Co-operative Association, for itself and as the agent of the other respondents, agreed "to fill the orders taken".

This contention also depends on the interpretation to be placed on the entire agreement. If the trial court's construction of the language of the agreement is correct, respondents simply agreed to furnish to appellant for sale by him the entire output of a certain designated waste product. Respondents did not agree or guarantee that there would be available for disposal any definite amount of the product. If, as the evidence showed, only 561¾ tons of the feed were produced and this entire tonnage was shipped in conformity with orders taken for the same by appellant, the respondents are not obligated to compensate appellant for the loss sustained by him through their failure to provide a greater amount of the product in the absence of a showing that the failure was due to bad faith on respondents' part or that respondents having the ability to manufacture the product arbitrarily refused to do so. We have heretofore indicated our opinion that the trial court's interpretation of the agreement finds ample support in the evidence and the failure to provide any larger amount of the product than was furnished is satisfactorily explained by evidence showing the mechanical difficulties encountered by respondents in attempting to manufacture the product.

Appellant's final contention is that the trial court erroneously failed to make findings with respect to a number of claimed issues of fact. No useful purpose would here be served in setting out these various issues and in discussing them. In our opinion the findings of fact which the trial court made are ample to dispose of the material issues presented in the case and are fully supported by the evidence.

The judgment is therefore affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 19, 1936.