[Civ. No. 22360. First Dist., Div. One. Feb. 3, 1966.]

ALMADEN-SANTA CLARA VINEYARDS, Plaintiff and Respondent, v. CHARLES PAUL, as Director of Agriculture, etc., et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, Walter S. Rountree, Assistant Attorney General, Donald H. Maffly and Roderick Walston, Deputy Attorneys General, Utley & Houck and Alden F. Houck for Defendants and Appellants.

Wallace, Garrison, Pascoe, Norton & Ray, John R. Pascoe and Jack Tomlinson for Plaintiff and Respondent.

SULLIVAN, P. J.—This is an appeal by Charles Paul, Director of Agriculture of the State of California (Director) and Philip J. Vogel, doing business as Vogel Farms (Vogel) from a judgment of the trial court ordering the issuance of a peremptory writ of mandate commanding said Director to set aside his order suspending the processor's license of Almaden-Santa Clara Vineyards, a corporation doing business as Almaden Vineyards (Almaden), respondent herein and petitioner below.

Almaden is engaged in the business of selling wine and is duly licensed as a processor of farm products pursuant to division VI, chapter 9 of the Agricultural Code (§§ 1299.18-1300.9i).[1] Vogel is a producer of grapes in California.

On March 12, 1963, Almaden and Vogel entered into a contract in writing under the terms of which Almaden agreed to buy certain grapes of Vogel's to be grown during the 1963 season, the varieties and approximate tonnage of which were specified in the contract. The contract is a printed form with blank spaces provided for the insertion of the varieties, tonnage and price of the grapes. These were filled in by hand-printing and contained the following *hand-printed* provision: "Buyer agrees to pay Seller a minimum price of [$]40.00 per ton subject to provisions of federal marketing order on grapes."

Attached to the face of the document as a part thereof was the following *typewritten* provision: "Price will be determined later this season by mutual agreement between buyer and seller. In case of disagreement, price will be the average price paid by wineries in the San Joaquin Valley for like

---

[1]Hereafter, unless otherwise indicated, all section references are to the Agricultural Code.

varieties as quoted by the Weekly Federal Marketing Reports for 1963. After agreement, the price shall be entered on the contract and initialed by buyer and seller.''

During September and October 1963 Vogel delivered to Almaden the grapes called for by the contract and Almaden paid Vogel therefor the sum of $119,545.15. These payments were made on the basis of prices quoted for the varieties of the grapes in the Federal Marketing News Service "San Francisco Weekly Wine Report" as the prices paid by wineries in the San Joaquin Valley.[2] Almaden took the position that this was payment in full for the grapes; Vogel, on the other hand, claimed that he was entitled to receive a minimum price of $40 per ton on all varieties sold. If Vogel was right, he had in fact received $23,340 less than he was entitled to.

Upon being refused this amount, Vogel on December 24, 1963, filed with the Department of Agriculture, Bureau of Market Enforcement, pursuant to section 1300.4,[3] a verified complaint alleging in substance that Almaden in violation of section 1300.4a[4] had "failed to pay [Vogel] in full for grapes at the time and in the manner specified in the written contract with the producer, or within the time and the manner required by Chapter 9, Division 6, of the Agricultural Code.'' On the basis of said complaint, the Director issued a notice of time and place of hearing and, through his Chief, Bureau of Market Enforcement, an order to show cause why Almaden's license should not be suspended or revoked.

The dispute between Almaden and Vogel over the payment of the grapes leading to the instant proceedings centered upon that portion of the contract providing for a $40 per ton

---

[2]The approximate tonnage delivered and the price paid per ton by Almaden for each variety of grape are the following:

| | | |
|---|---|---|
| Thompson | 2,747.5 tons | $33.50 |
| Palominos | 491.4 tons | $33.50 |
| Valle de Pinos | 70.1 tons | $42.50 |
| Grenache | 236.0 tons | $37.50 |

[3]Section 1300.4 provides in relevant part: ''The director, after hearing upon a verified complaint signed and filed with the director by any interested person, may revoke or suspend the license of any licensee, as the case may require, when he is satisfied that any such licensee has violated any provision of this chapter.''

[4]Section 1300.4a provides in relevant part: ''The director may . . . revoke or suspend any license, . . . when after a hearing as herein provided he is satisfied of the existence of any of the following facts, the existence of which is hereby declared to be a violation of this chapter: (a) That the applicant, or licensee, has failed or refused to pay for farm products at the time and in the manner specified in the contract with the producer, or as otherwise in this chapter provided; . . .''

minimum price "subject to provisions of federal marketing order on grapes." It was Vogel's position at the administrative hearing that the purpose of the minimum price provision was to afford him "insurance against a very marked slump or drop in price" in the event of a very low setaside regulation or of no setaside regulation under the Federal Marketing Program;[5] that the grape purchase agreement had nothing to do with whether there was going to be a setaside or not; and that the minimum price being applicable only to the free tonnage would provide a floor for Vogel in any unstabilized market with no setaside. Almaden's position, on the other hand, was that under the contract provision it would be obligated to pay the $40 minimum price for the free tonnage of grapes *if, but only if, a federal setaside order was in effect.* The Director's position below was that the clause in dispute "simply means that both parties must comply with the provisions of the federal marketing order on grapes"; that if both parties to the contract complied with all of the provisions of the federal marketing order, the $40 minimum would apply; that there was no contention by either party that the parties failed to comply with the order; and that Almaden erroneously interpreted the clause to mean that the minimum price specified was conditioned not only upon the existence of the federal marketing order but also upon the existence of a setaside regulation adopted pursuant to said marketing order.

The record discloses that the producers of grapes in July 1963, voting in a referendum required by the federal marketing order, favored the termination of the order after the third crop year ending June 30, 1964; that in August 1963

[5]The record discloses that a setaside order was a device employed under the authority of the Federal Grapes for Crushing Marketing Order issued by the United States Secretary of Agriculture effective August 26, 1961, (26 Fed. Reg. 7797) to stabilize grape prices and keep the market up. Under such order the Secretary of Agriculture in each of three crop years (including the crop year 1963), acting in conjunction with the Grape Crush Administrative Committee, could determine that the tonnage of grapes to be crushed would exceed the desirable free tonnage (i.e., that permitted to be used for the production of wine) and in order to control the volume could establish *free* and *surplus* percentages totalling 100 percent for any crop year. As a result the *free* percentage (free tonnage) could be used for the production of wine and the balance (surplus) was set aside for other uses. The "setaside" of surplus grapes by reducing the volume of grapes permitted for the production of wine and thus limiting the supply, sustained the price of such grapes.

N.B. The above marketing order and certain bulletins of the Grape Crush Administrative Committee relevant thereto have been included in the record now before us.

the Grape Crush Administrative Committee (see fn. 5, *ante*) recommended to the Secretary of Agriculture that the "desirable free tonnage" of grapes for the 1963 crop year be the actual crush; and that as a result there was no surplus control and therefore no "setaside" on 1963 crop year grapes under the Federal Grapes for Crushing Marketing Order.

On January 23, 1964, the complaint filed by Vogel with the Director came on for hearing at Fresno before H. S. Cann, Chief of the Bureau of Market Enforcement of the State Department of Agriculture. The hearing was held under and pursuant to the authority of division VI, chapter 9 of the Agricultural Code. Evidence was received[6] from both Vogel and Almaden concerning the circumstances under which the agreement was made, including those pertinent to the federal marketing order and setaside orders just discussed. At the request of Almaden's counsel, the hearing officer took official notice of the Federal Grapes for Crushing Marketing Order in effect for the 1963 crop year.

On March 6, 1964, the hearing officer issued his findings of fact and order. He found in substance that at the time of the Vogel-Almaden contract, and at all material times thereafter, the Federal Grapes for Crushing Marketing Order (see fn. 5, *ante*) was in full force and effect; that under said order there was no surplus control or setaside for 1963 crop year grapes; that between the time such last fact became known (approximately August 15, 1963) and the time of delivery of Vogel's grapes, "no attempt was made by respondent to modify or clarify the contract in view of the fact that there would be no set aside during the 1963 crop year"; and that the prices for the grapes set forth on Almaden's statements (see fn. 2, *ante*) "are different from and less than the minimum price as set forth in the contract . . . and are not acceptable to complainant as payment in full." From such findings the hearing officer concluded that Almaden "has violated Section 1300.4a(a) of the Agricultural Code, in having failed and neglected to make payment in full" and that

---

[6]Section 1300.3-2, subdivision (c) provides: "The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions. The rules of privilege shall be effective to the same extent that they are now or hereafter may be recognized in civil actions, and irrelevant and unduly repetitious evidence shall be excluded."

discipline should be taken against Almaden's license and ordered that said license "be and the same is hereby suspended from March 31, 1964 to the expiration date thereof, namely, January 14, 1965."[7]

On April 24, 1964, Almaden filed in the court below a petition for alternative writ of mandate against *both* the Director and Vogel. On May 14, 1964, after argument by counsel for Almaden and the Director, the matter was submitted on Almaden's petition, the return thereto and the record of the administrative proceedings for the Department of Agriculture without the court receiving any additional evidence.[8]

The trial court, after finding that the amount paid by Almaden to Vogel for the grapes was approximately $23,000 less than would be due if calculated on a $40 per ton minimum price, made the following crucial finding: "IX That the *handprinted provision* [quoted *supra*] contained in said contract . . . is *ambiguous in its terms.* That a *bona fide dispute arose and still exists* between petitioner and respondent Vogel as to the interpretation of this provision and the other price provisions of the contract. That under said circumstances, *the finding of* respondent, Charles Paul, Director of Agriculture, that petitioner *failed* and *neglected to make payment* in full in accordance with the terms of said contract within the meaning of section 1300.4a(a) of the Agriculture [*sic*] Code of the State of California *is not supported by the weight of the evidence and the suspension of petitioner's license was a prejudicial abuse of discretion."* (Italics added.)[9] From these findings the court concluded that Almaden was entitled to a judgment for the issuance of a peremptory writ of mandate commanding the Director to

---

[7]Actually the findings and order was made by Charles Paul, Director by Mr. Cann as hearing officer. Subsequently, the effective date of the order was postponed from March 31, 1964, to April 30, 1964, and thereafter to May 15, 1964.

[8]Vogel filed a "response" to the petition and to the alternative writ but did not appear at the hearing. At the conclusion of the hearing, the court announced its decision to issue a peremptory writ.

[9]The court also found: "X That judgment entered herein shall not be deemed to estop respondent Vogel, either directly or collaterally, from pursuing any legal remedy he may have against petitioner for breach of contract or otherwise; nor shall it be deemed to estop him from litigating any issue of fact relating to the interpretation or breach of said contract. That in the event of such legal action, petitioner shall be entitled to assert any defenses it may have."

immediately set aside his order suspending Almaden's license. Judgment was entered accordingly. It is from this judgment that the Director and Vogel have taken their separate appeals.

The principles defining the respective functions of the trial court and of this court are well settled. Since the Director of Agriculture is a state officer conducting a statewide agency (§§ 20, 21) and carrying out statutory powers only, the trial court was authorized to exercise its independent judgment on the evidence of the administrative hearing without being bound by the findings made at the conclusion of such hearing. (Code Civ. Proc., § 1094.5, subd. (c) ; *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20] ; *Tringham* v. *State Board of Education* (1958) 50 Cal.2d 507, 508 [326 P.2d 850] ; *Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 80 [17 Cal.Rptr. 488, 366 P.2d 816] ; *Manning* v. *Watson* (1952) 108 Cal.App.2d 705, 712 [239 P.2d 688] ; *McPherson* v. *Real Estate Comr.* (1958) 162 Cal.App.2d 751, 752 [329 P.2d 12] ; *Post* v. *Jacobsen* (as State Director of Agriculture) (1960) 180 Cal.App.2d 297, 301 [4 Cal.Rptr. 817] ; *Wahl* v. *Division of Real Estate* (1961) 197 Cal.App.2d 97, 100 [17 Cal.Rptr. 25] ; *Caro* v. *Savage* (1962) 201 Cal.App.2d 530, 538 [20 Cal.Rptr. 286].) On appeal, it is our function to determine whether or not there is any substantial evidence, contradicted or uncontradicted, which will support the findings of the trial court. (*Moran* v. *Board of Medical Examiners, supra*; *Tringham* v. *State Board of Education, supra*; *Manning* v. *Watson, supra*; *McPherson* v. *Real Estate Comr., supra*; *Post* v. *Jacobsen* (as State Director of Agriculture), *supra*; *Wahl* v. *Division of Real Estate, supra*; *Caro* v. *Savage, supra*; see also *Beach* v. *Contractors State License Board* (1957) 151 Cal.App.2d 117, 120 [311 P.2d 51] ; *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 774 [4 Cal.Rptr. 910] ; *Hope* v. *Contractors' State License Board* (1964) 228 Cal.App.2d 414, 422 [39 Cal.Rptr. 514].)

In the instant case the trial court came to the conclusion that the disciplinary action taken against Almaden by the Director was not warranted and that the Director's order of suspension should be set aside. Although the court was required to exercise its independent judgment on the evidence (*Tringham* v. *State Board of Education, supra,* 50 Cal.2d 507, 508 and see other cases cited *supra*), an analysis

of the court's findings discloses that it did not fully perform this function. In the first eight paragraphs of its findings of fact the court merely found in substance: that Almaden and Vogel entered into the contract in question; that Vogel delivered the grapes and Almaden paid therefor a specified sum based on published prices paid by other wineries; that the amount paid was approximately $23,000 less than what *would* be due *if* calculated on the basis of a minimum price of $40 per ton; and that Vogel still claims that the sum of approximately $23,000 is still due. None of these facts were particularly in dispute. In essence the controversy was whether Almaden paid Vogel according to the terms of the contract.

This vital issue which was decided by the Director does not seem to have been passed upon by the court. An examination of the court's crucial finding (IX), quoted *supra*, discloses a statement merely that the minimum price provision "is ambiguous in its terms" and that "a bona fide dispute arose and *still exists*" (italics added) between Almaden and Vogel. The existence of an ambiguity and of a dispute appears to have been recognized by all parties from the outset. The court, however, made no factual determination that would settle the dispute and did not decide one way or the other whether Almaden paid Vogel in full. The remaining portion of paragraph IX to the effect that the Director's finding on this issue "is not supported by the weight of the evidence" amounts to a conclusion of law,[10] itself unsupported by any specific finding that Almaden made full payment and that it did not commit the act with which it was charged. (Cf. *Tringham* v. *State Board of Education, supra,* 50 Cal.2d 507, 508.) To put it in another way, the court having in effect tried the case de novo on the same record and having been confronted with the necessity of determining factual issues was required to make findings of fact unless the same were waived. (Code Civ. Proc., §§ 632, 1109; *International Assn. of Fire Fighters* v. *City of Palo Alto* (1963) 60 Cal.2d 295, 300 [32 Cal.Rptr. 842, 384 P.2d 170]; *Davis* v. *State Board of Optometry* (1939) 35 Cal.App.2d 428, 434 [95 P.2d 959]; *Koehn* v. *State Board of Equalization* (1958) 166

[10]Although a conclusion of law, it does not lose its characteristics as such by being placed among findings of fact. (*Estate of Blake* (1910) 157 Cal. 448, 456 [108 P. 287], overruled on other grounds in *Estate of Stanford* (1957) 49 Cal.2d 120, 129 [315 P.2d 681]; *Lenchner* v. *Chase* (1950) 98 Cal.App.2d 794, 802 [220 P.2d 921]; *Jon-Mar Co.* v. *City of Anaheim* (1962) 201 Cal.App.2d 832, 840 [20 Cal.Rptr. 350]; *Solley* v. *Solley* (1964) 227 Cal.App.2d 522, 525-526, fn. 1 [28 Cal.Rptr. 802].)

Cal.App.2d 109, 115 [333 P.2d 125]; *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 825 [25 Cal.Rptr. 798].) It was therefore incumbent upon the court to make findings on all material issues in the case. (Code Civ. Proc., § 632; *James* v. *Haley* (1931) 212 Cal. 142, 147 [297 P. 920]; *Parker* v. *Shell Oil Co.* (1946) 29 Cal.2d 503, 512 [175 P.2d 838]; *De Burgh* v. *De Burgh* (1952) 39 Cal.2d 858, 873 [250 P.2d 598]; *Edgar* v. *Hitch* (1956) 46 Cal.2d 309, 312 [294 P.2d 3].) In the instant case extrinsic evidence was properly admitted at the administrative hearing as an aid to the interpretation of the grape purchase contract. Since such evidence was in conflict or at least susceptible of conflicting inferences, the question of the meaning of the contract was one of fact. (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 444 [116 P.2d 62]; *Scott* v. *Sun-Maid Raisin Growers Assn.* (1936) 13 Cal.App.2d 353, 359 [57 P.2d 148]; *Santa Clara Properties Co.* v. *R.L.C., Inc.* (1963) 217 Cal. App.2d 840, 847 [32 Cal.Rptr. 333]; *Harabedian* v. *Zurich Ins. Co.* (1963) 218 Cal.App.2d 702, 705 [32 Cal.Rptr. 813]; *Wechsler* v. *Capitol Trailer Sales* (1963) 220 Cal.App.2d 252, 264 [33 Cal.Rptr. 680].) As we have previously noted, the trial court failed to make the crucial finding as to what price was due Vogel under the contract.

Indeed, an inspection of other parts of the record for the purpose of ascertaining the reasoning of the court and thus throwing light on its findings (*Oldis* v. *La Societe Francaise* (1955) 130 Cal.App.2d 461, 471-476 [279 P.2d 184]; cf. *McAllister* v. *Metzger* (1963) 220 Cal.App.2d 692, 708, fn. 13 [33 Cal.Rptr. 879]), convinces us that it was the purpose and intent of the court *not* to pass upon the pivotal issue in the case. The record discloses in a number of places observations by the court that it did not know what the contract meant, that the instant proceeding was not the proper one in which to resolve the dispute over the meaning of the contract provision and that the court was not required to decide whether Vogel received full payment.[11] The court thereupon directed that there be incorporated in the proposed findings an appro-

---

[11]The views of the Director and the learned trial judge are epitomized in the following colloquy: "MR. MAFFLY [Deputy Attorney General]: —the producer cannot be protected, and that is what this is, this statutory device is the way of protecting producers' farm products, they cannot be protected as long as the processor can come into court and before the agency and say, 'There is something ambiguous about the contract.' THE COURT: Well, it is more than coming in and saying it is ambiguous, it has to be ambiguous. It says, 'Buyer agrees to pay seller a minimum price of $40.00 per ton.' If that would have been all, and he didn't pay

priate statement to the effect that all legal remedies of Vogel would be deemed preserved. This apparently resulted in paragraph X of the findings. (See fn. 9, *ante.*) As we have already pointed out, extrinsic evidence was received by the hearing officer in aid of the interpretation of the contract. In addition, the court had the right to receive new evidence on this issue upon a showing that, in the exercise of reasonable diligence, such evidence could not have been introduced before the Director. (Code Civ. Proc., § 1094.5, subd. (d); *Dare* v. *Board of Medical Examiners* (1943) 21 Cal.2d 790, 799 [186 P.2d 304]; *Thayer* v. *Board of Osteopathic Examiners* (1958) 157 Cal.App.2d 4, 9 [320 P.2d 28].)

This leads us to a further observation. The reference in paragraph IX of the findings to the existence of a bona fide dispute as to the meaning of the contract, coupled with the court's obvious disinclination to pass on the issue, is somewhat indicative of a feeling on the part of the court that the Director was not empowered to take disciplinary action where such dispute existed. Chapter 9 of Division VI of the Agricultural Code, under which the instant proceedings were commenced, deals with the licensing (§ 1300.1), bonding (§ 1300.1a), investigation (§§ 1299.20, 1300.3) and disciplining (§ 1300.4) of processors of farm products. As the Attorney General points out to us, these and related sections were designed to make sure that the processor has paid the producer in accordance with the contract between them.

Thus, where such failure has occurred, the director, in addition to taking disciplinary action against the licensee by revoking or suspending his license (§ 1300.4), may also impose other sanctions. Section 1300.1a provides that before any license is issued to any processor, the latter must execute and deliver to the director a $5,000 bond "to the State in favor of every producer-creditor of farm products grown within the State of California"; and that upon the "failure by a processor to pay producer-creditors for farm products" the director, after ascertaining the claims of producer-creditors, demanding payment thereof on the bond and being refused the same, "shall thereupon bring an action on the bond in

---

it, the decision would stand. But when you add a proviso, 'subject to provisions of the federal marketing order on grapes,' you say that he still has to pay? MR. MAFFLY: Well, if you think that creates an ambiguity, I think that has to be resolved, it certainly has to be resolved. THE COURT: It is not to be resolved in mandate. The Court simply says that there could not be a wilful failure to pay because, so far as the Court is concerned, this is a patently ambiguous contract."

behalf of said producer-creditors.'' The director ''may bring an action to enjoin the violation or the threatened violation'' of any provision of Chapter 9 or any order made thereunder (§ 1300.6, subd. (3)) and may bring an action to recover civil penalties. (§ 1300.6, subd. (4).) Where the processor ''Having the ability to pay, wilfully after demand refuses except in the case of a bona fide dispute, to pay for any farm products purchased by him'' under the conditions prescribed in the statute, he is subject to criminal penalties. (§ 1300.6, subd. (1)(b).)

Section 1300.3 provides for investigation by the director of complaints involving the processor's failure to make payment for farm products; the loss of the director's jurisdiction to act on the complaint in the event of a bona fide dispute and the submission of such dispute to arbitration; the restoration of the director's jurisdiction to act in the event of the failure or refusal of the arbitrators to act; and thereafter the taking of disciplinary action against the processor if the director is unable to effect a satisfactory settlement.[12]

As we think the Attorney General correctly argues, the clear legislative intention and purpose behind the above-mentioned sections is that the producers shall be assured full

[12]Section 1300.3 provides in relevant part: ''The director, upon his own motion may or upon the verified complaint of any interested party, shall investigate, examine, or inspect any transaction *involving the failure of the processor to make payment for farm products* within the time specified for such payment in the contract of sale and purchase between the producer and the processor, in accordance with the terms of said contract or in accordance with the provisions of this chapter. *Should the complaint be a bona fide dispute* . . . involving the failure or refusal to accept and pay for farm products bought or contracted to be bought from a producer by a processor, . . . the director shall have no jurisdiction to act upon such complaint if the *processor* within ten (10) days after notice by the director of the filing of such verified complaint *has submitted such dispute to arbitration* in accordance with the provisions of a written contract; provided, however, that the jurisdiction otherwise reserved to the director in this chapter *shall be deemed restored* for the purposes of this chapter if the arbitrators, without reasonable cause, fail, refuse or neglect to adjudicate the matter of dispute within ninety (90) days from the date the matter was submitted to arbitration; provided, also, that the director *shall have jurisdiction over any such complaint or dispute* if the processor has failed to perform in accordance with any arbitration award made in accordance with the terms of such written contract. . . . [After service of complaint and notice of hearing and a hearing thereon,] if he [the director] is satisfied that the licensee has violated any provisions of this chapter he may issue an order suspending or revoking the processor's license or placing such license under such probationary terms and conditions as may be necessary to obtain compliance with the provisions of this chapter by such licensee. . . .'' (Italics added.)

payment for their farm products, that the director has jurisdiction to take disciplinary action against processors for their failure to pay for such products regardless of any dispute between the processors and the producers over such alleged nonpayment, and that the director's jurisdiction to take disciplinary action is not lost or diminished because of any dispute except in the single instance and under the conditions prescribed by section 1300.3 where the dispute has been submitted to arbitration. We are in accord with the Attorney General's view that any different interpretation would permit the processor merely by opposing the claim and disputing its validity to emasculate the director's powers and frustrate the main purpose of the statutes. Indeed, it is noteworthy that in this court Almaden has presented no counter-argument questioning the Director's jurisdiction.

We conclude, therefore, that the judgment should be reversed because the findings of fact are inadequate, because the court failed to make a finding on a material, indeed *the crucial*, issue and because the court's determination as to the evidentiary support of the administrative findings did not give proper recognition to the Director's jurisdiction. We observe that since the Director was clearly empowered to take disciplinary action against Almaden, the issues raised on judicial review of his action do not dissolve because the contracting parties may have independent civil remedies available to them.

It is also to be noted that Almaden's petition filed below seeks no relief against Vogel although naming him as a respondent. Discipline was imposed by the Director, not Vogel; the petition prayed for issuance of a writ directed to the Director only; the judgment was rendered against him only; and the peremptory writ of mandate issued pursuant thereto was directed to him only. The record reflects that the court and counsel appearing for the parties did not think that Vogel was a proper party. This is not a case where a person whose complaint has been rejected by an administrative board or agency institutes proceedings for a writ of mandate. (Cf. *Bodinson Mfg. Co.* v. *California Emp. Com.* (1941) 17 Cal.2d 321, 330 [109 P.2d 935]; *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125, 130 [173 P.2d 545].) On remand, the trial court should dismiss the instant proceedings as against Vogel.

It is ordered, therefore, that the judgment ordering issuance of a peremptory writ of mandate be reversed and that

the cause be remanded with directions to the trial court to dismiss the proceedings as to the respondent Philip J. Vogel, doing business as Vogel Farms; subject to its right to receive additional evidence as provided by law, to make and file findings of fact on all the issues involved in conformity with the views herein expressed; to draw proper conclusions of law therefrom; and to enter judgment accordingly. Such findings of fact, conclusions of law and judgment shall be prepared, signed, filed and entered in the manner provided by law.

After the record on appeal was filed with this court but before filing its respondent's brief herein, Almaden moved to dismiss this appeal upon the ground, among others, that it was moot. We denied the motion without written opinion. Almaden filed no petition for hearing in the Supreme Court. Almaden now makes the same contention in its brief. In our denial of the previous motion we did not grant leave for its renewal nor did we declare that its denial was without prejudice. Our prior ruling must be deemed final. (*Tyrrell* v. *Baldwin* (1889) 78 Cal. 470, 471-472 [21 P. 116]; *White* v. *Sweeney* (1955) 138 Cal.App.2d 199, 202 [291 P.2d 77]; see *Pigeon Point Ranch, Inc.* v. *Perot* (1963) 59 Cal.2d 227, 230-231 [28 Cal.Rptr. 865, 379 P.2d 321] and cases there cited.) Moreover, we think it was correctly made.

The motion to dismiss the appeal is denied. The judgment is reversed and the cause is remanded to the trial court to proceed with the disposition thereof under the directions and in conformity with the views herein expressed.

Molinari, J., and Sims, J., concurred.