[Civ. No. 35209. Second Dist., Div. Two. Aug. 4, 1970.]

KAUFMAN & BROAD BUILDING CO., Plaintiff and Appellant, v. CITY & SUBURBAN MORTGAGE CO., Defendant and Respondent.

**COUNSEL**

Richards, Watson & Hemmerling, Clifford A. Hemmerling and Joseph P. Myers for Plaintiff and Appellant.

Edward E. Everly for Defendant and Respondent.

## OPINION

**COMPTON, J.**—This is an appeal from a judgment entered pursuant to a directed verdict in favor of defendant. Plaintiff sought declaratory relief and damages for breach of a contract to provide loans for the purchase of homes constructed and marketed by plaintiff.

Plaintiff and appellant, Kaufman and Broad Building Company (hereinafter referred to as "K and B"), is one of the largest subdividers and builders of low and medium priced houses in California.

Defendant and respondent, City & Suburban Mortgage Company, is a mortgage banker and correspondent for various large institutional investors.

In early 1966, K and B was developing a "model complex" in Huntington Beach given the advertising name "Shorecrest." In order to market the several hundred homes in Shorecrest, K and B sought forward loan commitments from institutional investors. Once K and B obtained these commitments it would in turn offer full home financing to its customers. It was contemplated by K and B that a substantial number of these home-buyer loans would be FHA or VA guaranteed.

On May 24, 1966, Eli Broad and Eugene S. Rosenfeld, representatives of K and B, met with James A. Edmonds, Jr., president of City & Suburban Mortgage Co., to discuss defendant's proposed commitment to the Shorecrest loans. Uncontradicted testimony established that the parties discussed various matters concerning the substance and content of the proposed loan commitment.

On May 27, 1966, Edmonds, on behalf of the defendant, sent to K and B a letter which in substantial part read: "Pursuant to our telephone conversations and our meeting at your office on May 24, . . . [defendant] hereby commits to close 5¾% FHA/VA's with maximum of 30-year maturity on the above referenced subdivision [Shorecrest] in the amount of $4,000,-000 over a period of nine months, terminating March 31, 1967, at a price of 95.5 discount to . . . [plaintiff] plus 1% origination fee from the purchasers. . . . Should this commitment be acceptable to you, it will be necessary for . . . [plaintiff] to deposit $40,000 with . . . [defendant] representing 1% good faith deposit."

On June 1, 1966, Rosenfeld called Edmonds to discuss several of the conditions included in the May 27th letter.

On June 7, 1966, Broad telephoned Edmonds to notify defendant that plaintiff would accept the May 27th letter of commitment.

Later in the day of June 7, 1966, Broad mailed to defendant the letter of the 27th, signed under the pretyped words "Accepted: Kaufman and Broad Building Company." Attached to that letter was a check for $40,000 and the following separate letter which in substantial part read: "Enclosed you will find an accepted, signed copy of your commitment letter dated May 27, 1966, together with our deposit check in the amount of $40,000. . . . Confirming your conversation with Gene Rosenfeld, the commitment obligates you to purchase all loans that are approved by FHA and/or VA."

It is of interest to note that these negotiations proceeded against a background of an unstable money market. On June 10, 1966, the Federal National Mortgage Association lowered the market price on mortgage loans that they would accept. Consequently, the money market tightened and mortgage bankers had substantial difficulty thereafter obtaining "back-up commitments."

Following the exchange of letters a number of conferences and telephone conversations took place.

Between June 7, 1966 and July 28, 1966, defendant made several substantial yet unsuccessful efforts to obtain "back-up" commitments from large institutional investors. In seeking these back-up commitments, defendant made statements to the effect that it had a "binding commitment with K and B."

In July 1966, K and B sent 23 loan applications to City & Suburban. Of these applications defendant rejected 15 loans and sent them back to K and B marked "insufficient credit."

On July 25, 1966, K and B sent a telegram to City & Suburban Mortgage notifying it that K and B considered the rejection of the loans as a breach of the commitment agreement. K and B advised defendant that it would sell the rejected loans at the best attainable price and hold defendant liable for all damages resulting from defendant's "arbitrary" refusal to process past, present and future loans submitted by K and B. K and B warned that further "arbitrary [rejections]" would lead to legal proceedings.

On July 28, 1966, City & Suburban sent to K and B the $40,000 uncashed check and a letter of rescission.

Plaintiff filed this action on September 12, 1966. The pleadings are of substantial importance to the resolution of this appeal. The complaint alleges in paragraph 7 of plaintiff's designated "First Cause of Action" that "On June 7, 1966, plaintiff and defendant, . . . made and entered into

a written contract, dated May 27, 1966, . . . A copy of said written contract . . . is attached hereto, . . ."

The complaint pleads a "Second Cause of Action" which realleges the allegations contained in the "First Cause of Action." The "Second Cause of Action" in effect pleaded that the intent of the parties at the time of the offer of May 27 and the acceptance of June 7 was that defendant would become obligated to fund all loans approved by either the VA or the FHA and that it would not have the right to impose its own credit criteria or to reject loans based on that criteria. This type of commitment is commonly referred to in the industry as an "all credits commitment."

By agreement of the parties the trial was bifurcated and proceeded to trial on the issue of liability, leaving the issue of damages to be dealt with at a later date.

Throughout the three-week trial, evidence was introduced by both sides concerning (1) the substance of the several conversations between the parties on and after May 24; (2) the custom and usage in the industry concerning the failure by a mortgage banker to specifically reserve the right to impose an independent credit check on each FHA/VA home-buyer loan application; (3) the conduct of the parties following the May 24 conversation; and (4) the general stature and experience of the parties in the industry. All of this evidence was designed to establish the intent of the parties and the meaning that they attached to the phrase in the May 27 letter ". . . hereby commits to close 5¾% FHA/VA's . . ."

At the conclusion of the evidence the trial court granted a motion for a directed verdict for the defendant on the "First Cause of Action," stating that it believed the plaintiff had abandoned its "Second Cause of Action," and having done so was confined to the "four corners" of the contract.

The court further held that inasmuch as the "First Cause of Action" did not plead ambiguity, the parol evidence could not be considered.

The court's granting of the motion for a directed verdict was based on the conclusion that in the last analysis the contract as pleaded was not ambiguous. Accordingly, the court ruled out the extrinsic evidence.

Subsequent to his ruling rejecting the extrinsic evidence the court found that, ". . . what happened here . . . is that the parties did have some discussions, and a written proposal was submitted, and it was silent on this very important question, very material question of all credits. So there either was not a meeting of the minds or there was a counter proposal or both. And in either event it wouldn't appear to be that a valid contract was established by the letter of May 27."

Plaintiff has appealed from the judgment entered on November 22, 1968. The judgment decreed that ". . . plaintiff . . . recover nothing by reason of its *complaint, . . .*" (Italics added.)

At the hearing on the motion for a new trial, the trial court entered an order purporting to be a dismissal of the plaintiff's "Second Cause of Action" under section 581, subdivision 4 of the Code of Civil Procedure. Plaintiff has not appealed from that order.

Whether this belated minute order constitutes an attempt by the trial court to comply with the provisions of section 581d of the Code of Civil Procedure and to make that order *nunc pro tunc* to the time of the granting of the motion for the directed verdict, or whether it amounts to an improper attempt to modify the final judgment in contravention of the provisions of sections 657 and 662 of the Code of Civil Procedure, we need not decide.

It is patently clear (as will be pointed out below) that the trial court's action in decreeing that the plaintiff's "Second Cause of Action" had been abandoned was such an integral part of the judgment ultimately rendered that the validity of the purported order of dismissal is properly before us on an appeal from the judgment.

### DISCUSSION

The central issue on this appeal is whether the trial court in directing a verdict for the defendant improperly withdrew issues of fact from the consideration of the jury.

The trial court's directed verdict was fatally founded on (1) a misapplication of section 581, subdivision 4 of the Code of Civil Procedure; (2) a misconception of plaintiff's pleadings, and (3) a misinterpretation of what were questions of law and what were questions of fact.

Section 581 of the Code of Civil Procedure provides in part: "An action may be dismissed in the following cases: . . . 4. By the court, with prejudice to the cause, when upon the trial and before the final submission of the case, the plaintiff abandons it." This statute is the foundation for the procedure of voluntary dismissal with prejudice on motion of the plaintiff and order of the court. (*Burnett* v. *Burnett*, 88 Cal.App.2d 805, 807 [199 P.2d 685]; see also, 2 Witkin, Cal. Procedure (1954) p. 1663.)

Although the section appears to grant to the court a power to dismiss, the reported cases interpreting this section all proceeded on some affirmative action by the plaintiff in abandoning his cause of action. (*Applegate* v. *Wilson,* 156 Cal.App.2d 330, 336 [319 P.2d 401]; *Carvel* v. *Arents,* 126 Cal.App.2d 776, 779 [272 P.2d 858]; *Burnett, supra,* at p. 807;

*Casner* v. *Superior Court,* 23 Cal.App.2d 730, 732 [74 P.2d 298]; *Franks* v. *Cesena,* 192 Cal. 1, 3 [218 P. 437]; *McDonald* v. *California Timber Co.,* 2 Cal.App. 165 [83 P. 172]; *Richards & Knox* v. *Bradley,* 129 Cal. 670, 672 [62 P. 316].) In other words, section 581, subdivision 4 has traditionally been a mechanism by which a plaintiff (*and not the court*) voluntarily dismissed an action which has been expressly and intentionally abandoned.

■ We hold that the provisions of section 581, subdivision 4 provide for a voluntary dismissal which must be predicated upon a clear, unequivocal and express intent to abandon an action. Such intent must be demonstrated to the court by way of a motion to dismiss, stipulation of the parties or some other form of express intent on the record.

■ In the case at bar the trial court based its directed verdict to a substantial extent on the grounds that plaintiff had abandoned its "Second Cause of Action." The judge emphasized the impact of the "abandonment ruling" during the motion for a new trial, stating ". . . it's just inconceivable that I would have ruled as I did on the motion for directed verdict if the Second Cause of Action was there, . . . And Section 581, subdivision 4, provides that an action may be dismissed by the Court with prejudice to the cause when upon the trial and before the final submission of the case the plaintiff abandons it. And in my opinion that's what happened here."

The court based this decision on an imperfect memory of statements by counsel made at a conference in the court's chambers. It is unnecessary to set out in detail the colloquy between court and counsel. Suffice to say there was a discussion between the court and counsel concerning the second cause of action and how it would be dealt with.

The statement made by plaintiff at this in-chambers conference was at best, ambiguous. Although plaintiff suggested that he *"might"* wish to abandon his second count at a future time, he qualified his statements repeatedly by reservation and equivocation. The record is devoid of any statement that could be mistaken for an unequivocal and voluntary motion to dismiss which demonstrated to the court an express intent to abandon plaintiff's "Second Cause of Action."

Subsequent events at trial further corroborate this view. Throughout the remainder of the trial considerable evidence was introduced concerning matters pleaded in the so-called "Second Cause of Action." No question concerning the propriety of this evidence was raised by the defendant or the court until the time of the motion for a directed verdict.

We are not persuaded by the judge's comment that the in-chambers

statement obligated plaintiff to specifically advise the court that he desired to proceed with the "Second Cause of Action." To the contrary, section 581, subdivision 4 requires that the plaintiff voluntarily and expressly indicate that he has abandoned an action.

Section 581, subdivision 4 was not intended to permit the court to make an independent judgment as to whether the plaintiff has abandoned his cause of action.

The value of this interpretation of the statute is demonstrated by what occurred in this case. Upon motion for a new trial the court as well as counsel found themselves unable to clearly remember what was said in the court's chambers and more importantly they forgot exactly what was decided there.

The legislative policy embodied in section 581 of the Code of Civil Procedure would appear to have two objectives:

(1) To permit plaintiff certain freedom of action in pursuing his cause; and

(2) To provide all parties with a final resolution of all the issues in the case.

(See *Hehr* v. *Swendseid*, 243 Cal.App.2d 142, 150 [52 Cal.Rptr. 107].) Neither of these objectives was served by the action here. The purported order of dismissal must be vacated.

Defendant argues that even if plaintiff did not abandon his "Second Cause of Action" the question is nevertheless moot because (1) the directed verdict on the "First Cause of Action" was determinative of the legal relationships of the parties leaving no basis for declaratory relief, and (2) the question of declaratory relief is itself moot—over three years having elapsed since the contract was to have terminated. We agree that the issue of declaratory relief is moot. However, this does not dispose of the matter. In discussing the trial court's action in invoking Code of Civil Procedure section 581, subdivision 4, we adopted that court's terminology of "Second Cause of Action" and assumed arguendo that such a thing existed and was subject to abandonment.

Restoring the complaint to its original configuration we now move to examine both so-called "causes of action" as the correct basis for discussion of the trial court's action in directing a verdict as to the "First Cause of Action."

Taken as a whole and reduced to its simplest terms the complaint alleged a written contract based upon the letters of May 27 and June 7. Addition-

ally, the complaint pleaded the interpretation which plaintiff contends the parties placed on the contract and that that interpretation was intended because of, among other things, custom and usage in the industry.

◼ "In California the phrase 'causes of action' is often used indiscriminately to mean what it says and to mean *counts* which state differently the same cause of action . . . ." (*Eichler Homes of San Mateo, Inc.* v. *Superior Court,* 55 Cal.2d 845, 847 [13 Cal.Rptr. 194, 361 P.2d 914].)

◼ Here there was only one set of operative facts pleaded. In other words, the first count pleaded one primary right and one primary duty, while the second count merely alleged additional circumstances out of which the primary right and obligation arose.

We hold then that the so-called "Second Cause of Action" was in reality a second count based on the same obligation and thus the same cause of action. (*Eichler Homes of San Mateo, Inc.* v. *Superior Court, supra,* at p. 847.)

◼ "The essence of a cause of action is the existence of a primary right and one violation of that right, . . ." (*Hilltop Properties* v. *State of California,* 233 Cal.App.2d 349, 354 [43 Cal.Rptr. 605].) "The cause of action as it appears in a complaint . . . will be the facts from which the plaintiff's primary right and the defendant's corresponding duty have arisen, together with the *facts* which constitute the defendant's delict or wrong." (Italics added.) (Pomeroy, Code Remedies (5th ed.) p. 528; see also *Eichler Homes of San Mateo, Inc.* v. *Superior Court, supra; Panos* v. *Great Western Packing Co.,* 21 Cal.2d 636, 638 [134 P.2d 242]; *Hilltop Properties* v. *State of California, supra,* at p. 354.)

The seeking of different kinds of relief does not establish different causes of action. (*Peiser* v. *Mettler,* 50 Cal.2d 594, 605 [328 P.2d 953, 74 A.L.R.2d 1], citing to *Security Loan etc. Co.* v. *Mattern,* 131 Cal. 326 [63 P. 482].)

It was proper to seek declaratory relief and damages for breach of contract in a single complaint where the action arose out of the same transaction. (*Marden* v. *Bailard,* 124 Cal.App.2d 458, 464 [268 P.2d 809].)

◼ This view of the pleadings answers the trial court's contention and the assertions of defendant that the plaintiff failed to plead ambiguity in the "First Cause of Action" and having abandoned the "Second Cause of Action" was foreclosed from seeking a jury determination of the factual issues raised by his extrinsic evidence.

◼ The interpretation of a contract and the determination of whether

the written contract is a complete expression of all the terms agreed upon are questions of law for the court.

 "But when parol evidence is introduced in aid of the interpretation of uncertain or doubtful language in the contract, the question of the meaning [or intent of the parties] is one of fact. If the meaning [or intent] is to be determined one way according to one view of the facts and another way according to another view, the determination of the disputed matter must be left to the jury." (12 Cal.Jur.2d, § 119, pp. 324-325.) (See also *Walsh* v. *Walsh,* 18 Cal.2d 439, 444 [116 P.2d 62]; *Almaden-Santa Clara Vineyards* v. *Paul,* 239 Cal.App.2d 860, 868 [49 Cal.Rptr. 256]; *Scott* v. *Sun-Maid Raisin Growers Assn.,* 13 Cal.App.2d 353, 359 [57 P.2d 148].)

 In the instant case, the issue before the court was whether the parties intended the letter of May 27, 1966, to be an "all credits commitment." K and B contended throughout that the letter was intended by Edmonds and subsequently understood by plaintiff to be a binding commitment on defendant to accept all FHA or VA approved loans up to the amount of $4,000,000. Conversely, City & Suburban contended that it had a right to independently check the credit of each applicant and accept or reject each application according to its own criterion.

Based on these contrary contentions concerning the interpretation to be given the May 27 letter, the trial court in the first instance correctly ruled that the letter was susceptible of more than one reasonable interpretation. Consequently, the court pursuant to *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641], and *Masterson* v. *Sine,* 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], initially agreed to permit testimony concerning the " 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of the contracting.' " (*Universal Sales Corp.* v. *California Press Mfg. Co.,* 20 Cal.2d 751, 761 [128 P.2d 665], cited in *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* at p. 40.)

· The role of the court in directing a verdict is firmly established in California. The court may grant a directed verdict " 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given.' " (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768], cited in *Estate of Caspar,* 172 Cal. 147, 150 [155 P. 631]; *Taylor* v. *Centennial Bowl, Inc.,* 65 Cal.2d 114, 120,

121 [52 Cal.Rptr. 561, 416 P.2d 793]; *Casey* v. *Proctor,* 59 Cal.2d 97, 100 [28 Cal.Rptr. 307, 378 P.2d 579].) The court may not weigh the evidence or rule on the credibility of the witnesses *(Estate of Lances, supra,* at p. 401), but must where the evidence is conflicting accept the evidence most favorable to the plaintiff as true. *(McNeal* v. *Greenberg,* 40 Cal.2d 740, 744 [255 P.2d 810].)

■ In the case at bar the court found itself in the anomalous position, at the time that it granted the motion for the directed verdict, of in effect rejecting all of the extrinsic evidence yet at the same time basing its ruling that there had been a failure of agreement on a material element of the contract upon the conflicts which were generated by that same extrinsic evidence. For example, the court said, "I have considered this testimony of Mr. Broad, which is certainly at best somewhat ambiguous with respect to the May 24th conference, but you still get down to the question—incidentally, Mr. Rosenfeld never mentioned any such thing occurring, and even Mr. Broad contradicted himself during the course of the case, . . ."

It is clear that the court was at the time it ruled on the motion for directed verdict weighing evidence and the credibility of witnesses.

Our view of the facts and the pleadings is that the plaintiff properly pleaded a contract between itself and the defendant which, according to the interpretation plaintiff placed upon the contract, was an "all credits commitment" by defendant. Plaintiff adequately alleged that this was the interpretation which the defendant also placed upon the contract. This would be true even if we adopted the trial court's position to the effect that the plaintiff was confined to his first cause of action. The letter of May 27 is not unambiguous.

Plaintiff's evidence of the conversations, the custom and usage and the conduct of the parties, if believed, would have supported plaintiff's contention that both parties intended that the contract be an "all credits commitment" and that the defendant's subsequent claims to the contrary were contrived as a result of his failure to obtain adequate back-up commitments.

Eli Broad testified that in the conversation with Edmonds on May 24, he explicitly called Edmonds' attention to the fact that this was to be an "all credits commitment." Gene Rosenfeld testified that in his telephone conversation of June 1, he told Edmonds that this commitment was to be an "all credits commitment." Edmonds admitted in his testimony that in the June 1 conversation the subject of "all credits" had been discussed, and that he had made the statement that he would take all loans. However, he contended that he had advised Rosenfeld that such a commitment was subject to approval by his board of directors. Eli Broad testified that during the

June 7 conversation the subject of an "all credits commitment" was discussed. Plaintiff offered testimony of an expert that according to custom and usage in the industry, language such as was used in the May 27 letter would constitute an "all credits commitment" and any right by the defendant to interpose its own credit check would have had to be specifically reserved.

Furthermore, defendant subsequent to June 7 did in fact process some loans and did in fact, in seeking back-up commitments, make statements to the effect that City & Suburban had a "binding commitment" with K and B. Defendant by denying the existence of the "all credits commitment" and by controverting the plaintiff's evidence concerning the substance of the conversations and the custom and usage simply created an issue of fact.

Essentially, this case turned on the credibility of witnesses, the determination of which should have been left to the jury. The trial court disregarded substantial evidence and inferences to be drawn from that evidence which, if adopted by the trier of fact, could have supported a judgment for the plaintiff.

We find it unnecessary to deal individually with all of the remaining issues raised by the parties—they being essentially subordinate to those issues dealt with in our opinion.

The judgment is reversed and the purported order of dismissal is vacated.

Roth, P. J., and Fleming, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 1, 1970.